**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Robert L. JOHNSON, Defendant–
Appellant.**

No. 91–5030.

United States Court of Appeals,
Tenth Circuit.

July 28, 1992.

Stanley D. Monroe, Tulsa, Okl., for defendant-appellant.

James L. Swartz, Asst. U.S. Atty. (Tony M. Graham, U.S. Atty., with him on the brief), Tulsa, Okl., for U.S.

Before SEYMOUR and BRORBY, Circuit Judges, and BROWN,* District Judge.

WESLEY E. BROWN, Senior District Judge.

The defendant-appellant Robert Johnson was charged in a sixty-three count indictment with various violations of the Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956 & 1957). A jury found him guilty on all but one count. Appellant was sentenced by the district court to 405 months imprisonment. On appeal, Johnson raises several challenges to the propriety of the convictions and the sentence.

The government alleged that the defendant masterminded a "peso scheme" which defrauded investors out of millions of dollars. According to the government, the defendant convinced investors that he was buying Mexican pesos at a discount rate and then reselling the pesos for their market value in American dollars. Johnson told potential investors that he had served in the war in Vietnam with a man from Mexico whose father was highly placed in the Mexican government. Johnson said that through this contact he had access to Mexican citizens and businesses that wanted to exchange pesos for dollars. The Mexicans wanted to convert their money to dollars, Johnson explained, because the peso was rapidly losing its value and the Mexicans preferred to hold a more stable currency. The defendant told investors that, depending on the number of trades he could make in a day, an investor could

---

* The Honorable Wesley E. Brown, United States Senior District Judge for the District of Kansas, sitting by designation.

realize anywhere from fifteen to twenty-five per cent profit per week.[1]

Several individuals who sent money to the defendant for investment in the peso scheme testified at the defendant's trial. They each testified that they began by giving relatively small amounts of money to the defendant for investment in the peso deal. At the defendant's request, they transferred money they wanted to invest in the deal by means of a wire transfer from their own bank to the defendant's account at the Sooner Federal Savings & Loan in Broken Arrow, Oklahoma. Shortly thereafter, the defendant would wire back the amount of "profit" supposedly made by the investor from the purchase and sale of pesos. The amount wired back by the defendant was often fifteen to twenty per cent of the initial investment. The huge "profits" being made by investors apparently convinced them to invest heavily in the scheme and numerous individuals wired a steady stream of money to the defendant. Several of the investors who testified at trial sent upwards of half a million dollars to the defendant. The defendant managed to gain their complete confidence.

An Internal Revenue Service agent who had examined the defendant's bank records determined that about five and a half million dollars were deposited into the defendant's account in shortly over a year's time. The agent further determined that approximately $1.8 million of that amount was withdrawn out of the account and was used by the defendant to purchase various items, including a house, a car, and assorted cashier's checks. Approximately $1.3 million worth of liquid assets was seized from the defendant when he was arrested. The remainder of the money had been intermittently wired back to investors in the form of "profits."

We find it unnecessary for purposes of this opinion to fully recount the evidence presented by the government relating to the defendant's involvement in the peso scheme; we simply observe that the evidence overwhelmingly supported a conclusion that the scheme was fraudulent and that the defendant was not using the investors' money to purchase and resell pesos.

Counts two and three of the indictment charged the defendant with violations of 18 U.S.C. § 1956(a)(1)(A)(i). That section provides:

**§ 1956. Laundering of monetary instruments**

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity....

shall be sentenced to, ... imprisonment for not more than twenty years....

The "specified unlawful activity" alleged in the indictment was wire fraud in violation of 18 U.S.C. § 1343. Count two of the indictment alleged that Johnson used the proceeds of a wire fraud to pay off the mortgage on his house in Tulsa in the amount of $122,796. Count three alleged that Johnson used wire fraud proceeds to purchase a 1989 Mercedes automobile.

Appellant's first argument is that the evidence was insufficient to support his conviction on counts two and three. Our standard of review on this issue is well established: "In judging the sufficiency of the evidence, we are bound to view the proof presented in the light most favorable to the government to ascertain if there is sufficient substantial proof, direct and circumstantial, together with reasonable inferences to be drawn therefrom, from which a jury might find a defendant guilty beyond a reasonable doubt." *United States v. Sullivan,* 919 F.2d 1403, 1431 (10th Cir.1990).

Appellant contends that the evidence did not show that the payment of the mortgage

---

**1.** A black market in the exchange of pesos apparently sprang up in reaction to attempts by the Mexican government in 1982 to regulate transfers of that currency. *See United States v. Nivica,* 887 F.2d 1110, 1113 (1st Cir.1989).

on his home was done "with the intent to promote the carrying on" of the wire fraud.[2] He argues that there was no evidence to support a conclusion that he paid off the mortgage in order to further the wire fraud activity. In response, the government points out that the defendant maintained an office in the home which he used to carry out much of the fraudulent activity.

■ Direct evidence of a defendant's intent is seldom available. Intent can be proven, however, from surrounding circumstances. *United States v. Leopard*, 936 F.2d 1138, 1141 (10th Cir.1991). We find that the evidence, when viewed in the light most favorable to the government, is sufficient to support the conviction on count two. The evidence clearly showed that the defendant used the office in his home to carry out the fraudulent scheme. In addition, the defendant's aura of legitimacy was bolstered in the minds of investors who saw the defendant's house. The circumstances give rise to an inference that the defendant paid the mortgage on the house so that he could continue using the office in furtherance of the fraudulent scheme. Although, as appellant points out, he could have retained the use of the office simply by continuing to make monthly mortgage payments, the fact is that he did not do so. Instead, he used wire fraud proceeds to retire the outstanding balance on the loan secured by the mortgage. Paying off the loan gave him the right to continue using the office and the home. The jury could legitimately infer that paying off the mortgage with wire fraud proceeds was done with the intent to promote the carrying on of the unlawful activity.

■ The evidence similarly supports the conviction on count three of the indictment. The evidence suggests that the defendant used the Mercedes described in count three to impress investors. The jury could conclude from the evidence that appellant purchased the car to promote the carrying on of his fraudulent scheme. Appellant argues that he had two Mercedes automobiles and that evidence was lacking to show that the one described in count three was used by him in furthering the peso scheme. He contends that the Mercedes described in count three was purchased for his wife. The defendant in fact told one of the investors that he had purchased this car for his wife. But the record contains some evidence that contradicts this assertion. Testimony indicated that the defendant used this particular car both before and after he was separated from his wife. Also, after the defendant talked about the car with the same investor mentioned above, the investor went and talked to the auto dealer who sold the car to the defendant. The dealer spoke very highly of the defendant, who had put a down payment of approximately $66,000 on the car. After speaking with the auto dealer and others about the defendant, the investor was persuaded that the defendant was a legitimate businessman. This evidence suggests that the defendant used the car to persuade investors to invest in his scheme. His use of the car in this manner further tends to show that he purchased the car with that purpose in mind. *Cf. United States v. Jackson*, 935 F.2d 832, 841 (7th Cir.1991) (No evidence that cellular phones purchased by the defendant played any role in his drug operation; evidence was therefore insufficient to show that their purchase was intended to promote his drug activities.) Taken as a whole, the evidence supports the jury's finding that the defendant engaged in the financial transaction of purchasing the car with the intent to promote the carrying on of the wire fraud activity.

Appellant's next argument is that the evidence was insufficient to support the convictions on counts four through sixty-three of the indictment. These counts were brought under 18 U.S.C. § 1957, which provides in part:

---

**2.** Appellant does not assert that the evidence was insufficient to show that he violated the wire fraud statute. Also, appellant does not challenge the jury's determination that he conducted the financial transactions specified in counts two and three of the indictment knowing that the property involved therein represented the proceeds of the wire fraud activity.

**§ 1957. Engaging in monetary transactions in property derived from specified unlawful activity**

(a) Whoever, ... knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).

\* · \* \* \* \* \*

(f) As used in this section—

(1) the term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument ... by, through, or to a financial institution....

(2) the term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense; ...

Counts four through thirty-one of the indictment against the defendant alleged violations of § 1957 based on twenty-eight separate wire transfers of funds from investors to the defendant's account in Tulsa, Oklahoma. Counts thirty-two through fifty-seven were based upon wire transfers of funds from the defendant's account to individual investors. The final charges in the indictment, counts fifty-eight through sixty-three, were based upon withdrawals by the defendant from his account in the form of cashier's checks. The funds involved in all of the transactions were alleged to be the proceeds of wire fraud.

Appellant's primary argument pertains to counts four through thirty-one. He argues that the transfer of funds from the investors to his account did not violate § 1957 because those transfers were not monetary transactions in "criminally derived property." [3] Although appellant's argument is characterized as a challenge to the sufficiency of the evidence, it raises a question concerning the proper scope of § 1957 and it requires us to interpret the language of the statute. Appellant's brief sets forth two basic arguments in support of his contention that the funds transferred to him were not "criminally derived property." First, he argues that the funds could not be considered the proceeds of a wire fraud until the wire fraud was completed. "Proceeds," according to appellant, are funds from a previous and completed criminal activity. Second, appellant contends that § 1957 requires that the proceeds of an offense be "obtained" before a defendant can engage in a monetary transaction with those proceeds. He points to the definition of criminally derived property, which is "any property constituting ... proceeds obtained from a criminal offense." § 1957(f)(2). He argues that he did not obtain the proceeds of the wire fraud until they were credited to his account. Thus, he maintains, the transaction in which those funds were wired to him did not involve "criminally derived property." Appellant cites *Homes by Michelle, Inc. v. Federal Savings Bank*, 733 F.Supp. 1495 (N.D.Ga.1990), in support of this argument.[4] The government's response is that

**3.** The essential elements of a § 1957 violation are that (1) the defendant engage or attempt to engage (2) in a monetary transaction (3) in criminally derived property that is of a value greater than $10,000 (4) knowing that the property is derived from unlawful activity, and (5) the property is, in fact, derived from "specified unlawful activity." *United States v. Lovett,* 964 F.2d 1029 (10th Cir.1992).

The only issue raised by appellant in regard to counts four through thirty-one relates to the third element: whether the transactions were in "criminally derived property." Appellant has raised no issue concerning whether the evidence was sufficient to show that he "engaged" in the transactions alleged. *See* Appellant's Reply Br. at 5. *Cf.* 18 U.S.C. § 2(b). He does not dispute that he knew that the funds were derived from

unlawful activity. Similarly, we see the issue concerning whether the transfer of funds from the investors' accounts to the defendant's account constituted "monetary transaction[s]." *See* § 1957(f)(1). *Cf. United States v. Bell,* 936 F.2d 337 (7th Cir.1991).

**4.** *Homes by Michelle, Inc. v. Federal Savings Bank,* 733 F.Supp. 1495 (N.D.Ga.1990), is a shaky foundation for appellant's position. The case involved a district court ruling on a motion to amend a complaint in a civil RICO case. The plaintiff sought leave to amend in order to allege a RICO violation predicated on the defendant's alleged violations of 18 U.S.C. § 1956. The district court refused to allow the amendment, finding that the plaintiff could not show a violation of § 1956. In so ruling, the court

"it was not necessary for these funds to have been received by appellant in order to acquire their denomination as 'criminally derived property.'" Appellee's Br. at 29.

Under § 1957, "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense. § 1957(f)(2). Because there is no other "property" at issue here, we are only concerned with the funds transferred by the investors to the defendant. We agree with appellant that under the facts presented here, the transfer of funds from the investors to the defendant's account did not constitute violations of § 1957.

Both the ordinary meaning of the word "obtained" and the legislative history behind § 1957 suggest that this section was not intended to apply to transactions of the type alleged in counts four through thirty-one. We turn first to the language of the statute. The statute itself defines criminally derived property in terms of proceeds "obtained" from a criminal offense. "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). "Obtain" most commonly means "to gain or attain possession or disposal of usually by some planned action or method." [5] *Webster's Third New International Dictionary,* 1559 (1961). This suggests that Congress viewed a violation of § 1957

as occurring only after the individual involved in the specified criminal activity gained possession or disposal of the proceeds generated by the criminal activity.

When the plain language of a statute does not unambiguously reveal its meaning, we turn to the legislative history. *United States v. Abreu,* 962 F.2d 1447 (10th Cir.1992) (*en banc*). The legislative history behind the Money Laundering Control Act of 1986 is fairly sparse. No committee reports were submitted by Congress with the Act. Two reports related to the Act contain some discussion of the purpose behind § 1956 and § 1957. *See* S.Rep. No. 433, 99th Cong., 2d Sess. (1986); H.R.Rep. No. 855, 99th Cong., 2d Sess., pt. 1 (1986). Neither of the reports sheds much light on the question before us, however. The examples of money-laundering activity discussed throughout these reports show that Congress had in mind the "classic" case of laundering drug money—that is, where a drug trafficker collects large amounts of cash from drug sales and, acting with the complicity of a banker or other person in a financial institution, deposits the drug proceeds in a bank under the guise of conducting a legitimate business transaction. The Act appears to be part of an effort to criminalize the conduct of those third persons—bankers, brokers, real estate agents, auto dealer and others—who have aided drug dealers by allowing them to dispose of the profits of drug activity, yet whose conduct has not been considered criminal

---

made some observations about § 1956 and § 1957, declaring that these sections "address what might be considered secondary criminal activity: conduct involving funds or property previously obtained by criminal means. Neither statute proscribes the underlying unlawful acts or what might be considered primary criminal activity." *Id.* at 1501. The court did not further elaborate on these comments.

The plaintiff in *Homes by Michelle* alleged that the defendants had financed a real estate subdivision in exchange for kickbacks from the developer. Such conduct would be a violation of 18 U.S.C. § 215. The plaintiffs further claimed that, as a result of this unlawful activity, the subdivision itself was criminally derived property under 18 U.S.C. § 1956. The court rejected this view, stating that "the proceeds from violations of 18 U.S.C. § 215, from a money-launder-

ing perspective, would be kickbacks [the defendants] received in exchange for [the subdivision] loans, not the loans themselves." *Id.* at 1501. The plaintiffs had apparently not alleged a financial transaction involving the kickback funds, however, and the court concluded that the plaintiffs had not stated a cause of action under RICO. *Id.* at 1502.

The court's discussion of the money laundering statutes in this context is of little value to appellant in this case. The court's allusion to "primary" and "secondary" criminal activity is not explained by reference to either the language of § 1956 or § 1957 or to any legislative history.

5. A secondary meaning of "obtain" is "to bring about or call into being." *Webster's, supra,* at 1559.

under traditional conspiracy law. It must be noted, however, that the Act itself prohibits a much broader range of conduct than just the "classic" example of money laundering.

Two recent cases examining the legislative history behind the Money Laundering Control Act of 1986 contain language suggesting that § 1957 would only apply to monetary transactions occurring after the completion of the underlying criminal activity. *United States v. Edgmon,* 952 F.2d 1206 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3037, 120 L.Ed.2d 906 (1992) and *United States v. Lovett,* 964 F.2d 1029 (10th Cir.1992) both dealt with double jeopardy challenges to convictions under the Money Laundering Control Act. In each of these cases we concluded that Congress intended to impose separate punishments for the money-laundering transactions and for the underlying criminal activity. In *Edgmon,* which dealt with 18 U.S.C. § 1956, we emphasized that the money-laundering statute was intended to be a separate crime distinct from the underlying offense that generated the money. *Edgmon,* 952 F.2d at 1213. We noted that the discussion throughout the Senate Report on § 1956 was of "the gap in the criminal law with respect to the post-crime hiding of the illgotten gains." *Id.* With respect to § 1956, we concluded that "Congress aimed the crime of money laundering at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior 'specified unlawful activity.'" *Id.* at 1214. In *United States v. Lovett, supra,* we reached the same conclusion with respect to § 1957. Although the issue raised in those cases is not the same question before us now, the discussion of Congress intent in enacting § 1957 is relevant to a proper interpretation of the statute. *Edgmon* and *Lovett* both suggest

that Congress intended the money-laundering statutes to apply to transactions occurring after the completion of the underlying criminal activity.

It is possible to construe the phrase "proceeds obtained from a criminal offense" more broadly than this. One might logically infer that Congress could have intended § 1957 to apply when the underlying criminal activity occurs simultaneously with a monetary transaction with the proceeds of the activity. In this case, the result achieved by causing the investors to wire the funds directly into the defendant's account was no different than if the defendant had first obtained the funds and then deposited them himself. This latter transaction would clearly have violated § 1957. It would be logical, then, to assume that the former transaction would also be proscribed by the statute. Yet, both the plain language of § 1957 and the legislative history behind it suggest that Congress targeted only those transactions occurring after proceeds have been obtained from the underlying unlawful activity. At the very least, the statute is ambiguous on this point because, after examining all the relevant material which might aid us in construing its provisions, a reasonable doubt persists as to the statute's intended scope. *Moskal v. United States,* —— U.S. ——, 111 S.Ct. 461, 112 L.Ed.2d 449, 458 (1990). Accordingly, the "rule of lenity" requires that we adopt the more lenient interpretation. *See United States v. Abreu, supra,* 962 F.2d at 1451.

The underlying criminal activity in this case was wire fraud, which the defendant accomplished by causing the investors to wire funds to his account.[6] Whether or not the funds that were wired to the defendant were "criminally derived property" depends upon whether they were proceeds

---

6. 18 U.S.C. § 1343 provides:

**§ 1343. Fraud by wire, radio, or television**
    Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any

writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

obtained from a criminal offense at the time the defendant engaged in the monetary transaction. We find they were not. Section 1957 appears to be drafted to proscribe certain transactions in proceeds that have already been obtained by an individual from an underlying criminal offense. The defendant did not have possession of the funds nor were they at his disposal until the investors transferred them to him. The defendant therefore cannot be said to have obtained the proceeds of the wire fraud until the funds were credited to his account. Thus, the transfers alleged in counts four through thirty-one of the indictment were not transactions in criminally derived property and the defendant's convictions on those counts are reversed.

Appellant's next argument is that the evidence was insufficient as to counts thirty-two through sixty-three of the indictment. These counts alleged violations of § 1957 based on transfers of funds from the defendant's account to the investors in the peso scheme. Appellant argues that the government did not show that the funds that he wired out of his account were the proceeds of wire fraud, stating "It is entirely possible that the funds paid out ... came from sources other than the investors." Appellant's Br. at 24.

██ We find that the evidence here was sufficient for the jury to conclude that these funds were in fact derived from specified unlawful activity. The evidence showed that over five and a half million dollars were deposited into the defendant's account at the Sooner Federal Savings & Loan. The government presented evidence that at least $2.4 million of this amount was from specific instances of wire fraud. The testimony and the defendant's bank records indicated that most of the remainder, about $3 million, came from other investors in the peso scheme. The source of approximately 1.2% of the funds deposited in the defendant's account could not be determined. The amount of funds withdrawn from the defendant's account in the transactions set forth in counts thirty-two through sixty-three was approximately $1.8 million. An examination of the defendant's

bank records gave no indication that the funds in the defendant's account came from any source other than investors in the alleged peso trades. Under the circumstances, the evidence was sufficient for the jury to find that the funds withdrawn were derived from the specified unlawful activity. *Cf. United States v. Blackman,* 904 F.2d 1250, 1257 (8th Cir.1990).

██ The government had the burden of showing that the criminally derived property used in the monetary transactions was in fact derived from specified unlawful activity. This does not mean, however, that the government had to show that funds withdrawn from the defendant's account could not possibly have come from any source other than the unlawful activity. Once proceeds of unlawful activity have been deposited in a financial institution and have been credited to an account, those funds cannot be traced to any particular transaction and cannot be distinguished from any other funds deposited in the account. The "tainted" funds may be commingled with "untainted" funds, with the result being simply a net credit balance in favor of the depositor. The credit balance gives the depositor a claim against the bank and allows him to withdraw funds to the extent of the credit. In the context of a withdrawal, the portion of § 1957 requiring a showing that the proceeds were in fact "derived from specified unlawful activity" could not have been intended as a requirement that the government prove that no "untainted" funds were deposited along with the unlawful proceeds. *Cf. United States v. Jackson,* 935 F.2d 832, 840 (7th Cir.1991). Such an interpretation would allow individuals to avoid prosecution simply by commingling legitimate funds with proceeds of crime. *Id.* This would defeat the very purpose of the money-laundering statutes.

██ Appellant's next argument concerns the admission into evidence of bank receipts reflecting wire transfers of funds from investors to the defendant and transfers from the defendant back to the investors. The receipts in question were given or sent to the investors by their individual

banks after a transaction affecting their account occurred. Each receipt showed the nature of the transaction in question—either a transfer in or out of the investor's account, the amount, date, and so forth. The district court rejected the defendant's argument that the receipts were inadmissible hearsay, finding that they met the "business records" exception to the hearsay rule found in Federal Rule of Evidence 803(6). Appellant contends that this ruling was erroneous because the receipts were admitted through the testimony of the individual investors rather than through a custodian of records from the banks. Appellant argues that the investors were not "qualified witnesses" under Rule 803(6) and that the government did not lay the proper foundation for admission of the receipts as business records.

The decision to admit or exclude evidence is within the sound discretion of the trial court and is reviewed on appeal only for an abuse of discretion. *United States v. Zimmerman*, 943 F.2d 1204, 1211 (10th Cir. 1991). An abuse of discretion is "an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Boren v. Sable*, 887 F.2d 1032, 1033 (10th Cir.1989) (*citing United States v. Cardenas*, 864 F.2d 1528, 1530 (10th Cir.1989)). Furthermore, when the matter being reviewed is a trial court's ruling on a hearsay question, we afford the trial court heightened deference. *Boren*, 887 F.2d at 1033.

It is apparent to us in light of this deferential standard of review that the district court's decision to admit this evidence was not an abuse of discretion. Rule 803(6) provides in part that the following is not excluded by the hearsay rule:

(6) **Records of regularly conducted activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the

custodian or other qualified witness, unless the source of the information or the method or circumstances of preparation indicate lack of trustworthiness.

The comments of the district court show that the court determined that the nature of the documents and the circumstances under which the investors received them were sufficient to establish their status as business records kept in the course of regularly conducted business activity. Rec. Vol. III at 189–92. The court further indicated that he considered the investors to be the custodians of the records, inasmuch as they were maintained by the investors to document transactions in their accounts, and that their testimony was sufficient to show the proper foundation. *Id.*

■ We do not agree with appellant that the failure to call the records custodians from the banks that generated the documents is determinative of the documents' admissibility under Rule 803(6). "A foundation for admissibility may at times be predicated on judicial notice of the nature of the business and the nature of the records as observed by the court, particularly in the case of bank and similar statements." *Federal Deposit Ins. Corp. v. Staudinger*, 797 F.2d 908, 910 (10th Cir. 1986) (*citing Weinstein's Evidence* at 803–178.) The record as a whole in this case establishes a sufficient foundation for the admission of the records under Rule 803(6). The record is replete with circumstances demonstrating the trustworthiness of the documents. There is simply no dispute that the transactions shown by the receipts took place as recorded. As noted above, bank records are particularly suitable for admission under Rule 803(6) in light of the fastidious nature of record keeping in financial institutions, which is often required by governmental regulation. The nature of the documents themselves as bank statements together with the testimony of the investors established that the records were made at the time of the transactions in question and were made in the course of a regularly conducted business activity. The accuracy of the documents and the fact that they were prepared by a person with

knowledge of the transactions were established both by the testimony of the investors and by comparison with the defendant's own bank records. In short, the record as a whole shows a sufficient foundation for the admission of the documents under Rule 803(6).[7] Under the circumstances, the investors were "qualified witness[es]" whose testimony, together with the other evidence, was sufficient to show a foundation for the admission of the documents. The district court did not abuse its discretion in admitting the evidence.

Appellant also argues that the admission of these documents violated his sixth amendment right to confront the witnesses against him. The transcript of the trial, however, shows that appellant failed to raise this constitutional argument in the district court. The only objection asserted by the defendant below was that the documents were hearsay because they did not meet the requirements of Rule 803(6). Rec.Vol. II at 77–79, 87, 91, 104; Rec.Vol. III at 189–192. In light of this, we review the judge's decision to admit this evidence only for plain error. *United States v. Jefferson*, 925 F.2d 1242, 1254 (10th Cir.1991). A plain error is fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done. *United States v. Lovett*, 964 F.2d 1029 (10th Cir.1992). It must be both obvious and substantial. *Jefferson*, 925 F.2d at 1254. As noted in *Jefferson*, however, we apply this rule less rigidly when reviewing a potential constitutional error, particularly when the failure to preserve the precise grounds for error is mitigated by an objection on related grounds. *Id.*

■ The Supreme Court has identified two factors that must be examined in the context of Confrontation Clause challenges to evidence falling within a hearsay exception. The first of these deals with the availability of the declarant of the statement to be subjected to cross-examination. In some circumstances, the Confrontation Clause requires a showing by the government that a declarant who is not present for cross-examination at the trial is "unavailable." *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597, 608 (1980). The extent of this requirement is not clear, however. The Court held in *United States v. Inadi*, 475 U.S. 387, 398, 106 S.Ct. 1121, 1128, 89 L.Ed.2d 390, 400 (1986), that the requirement did not apply to statements of co-conspirators falling within Rule 801(d)(2)(E). In light of the repetitive nature of business records, where the declarant typically would have little or no recollection of the contents of any particular document, the application of the availability requirement to evidence falling under Rule 803(6) is doubtful. *See Manocchio v. Moran*, 919 F.2d 770, 775–76 (1st Cir.1990) (The requirement does not apply to business records.). *Cf. White v. Illinois*, — U.S. —, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (The "unavailability rule" does not apply to evidence falling under the hearsay exceptions for spontaneous declarations and statements made in the course of receiving medical care; such statements reliability cannot be recaptured by later in-court testimony.) Whether or not this requirement might apply in some circumstances to business records, we conclude that the failure to impose such a requirement on the government in this case did not amount to plain error.

The second factor to be examined under the Confrontation Clause concerns the reliability of the out-of-court statement. The Supreme Court has indicated that this requirement can be met in either of two circumstances: where the hearsay statement "falls within a firmly rooted hearsay

---

7. Although we are not persuaded that the decision to admit this evidence was error, we note that the information contained in the receipts appears to be duplicated in other concededly admissible evidence. This indicates that any error in the admission of the receipts was harmless. The information contained in receipts reflecting outgoing wire transfers from the investors could have been read into evidence as a recorded recollection under Fed.R.Evid. 803(5). In fact the record indicates that many of the receipts were used for this purpose. As to the wire transfers initiated by the defendant, the same information contained in the investors' receipts was also reflected in the defendant's bank records from the Sooner Federal Savings & Loan. No contention is made that these latter documents were inadmissible.

exception," or where it is supported by "a showing of particularized guarantees of trustworthiness." *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). The hearsay statements at issue in this case clearly fell within a firmly rooted exception to the hearsay rule—the business records exception of Rule 803(6). As such, the admission of this evidence did not violate appellant's sixth amendment right to confront the witnesses against him.

■ Appellant's next argument is that the trial court erred by denying his request to subpoena two witnesses who would have testified about an incident involving one of the investors. The investor, Robert Hayworth, was called to testify by the government. On direct exam, Hayworth recounted his dealings with the defendant and told how he invested in the peso scheme. On cross-examination, defendant's counsel questioned Hayworth about an incident in which Hayworth went to the defendant's home in an effort to get his money back from the defendant. Defense counsel asked Hayworth whether in the course of that incident he had threatened to kidnap either the defendant's son or the daughter of defendant's girlfriend. Hayworth denied having done so. The defendant, who was indigent, asked the trial court to authorize the government to pay for subpoenas in order to call the girlfriend and her daughter as witnesses. The defendant asserted that these witnesses would testify that Hayworth had in fact made such a threat. The trial judge refused to authorize the subpoenas.

On appeal, Johnson contends that the district court abused its discretion by denying the request for the subpoenas. We need not engage in a lengthy analysis of appellant's claim because we find that any error committed by the district court on this issue was harmless. Appellant contends that the two witnesses he wanted to call to the stand would have shown that Mr. Hayworth was prejudiced against him. The impact of the alleged prejudice in this case, however, is so minuscule that we can state beyond a reasonable doubt that the failure to call these witnesses could not

have affected the outcome of the case. The government's evidence of the defendant's participation in the monetary transactions alleged in the indictment was overwhelming. The same is true of the evidence showing the fraudulent nature of the peso scheme and of the wire fraud committed in connection with that scheme. The impeachment of Mr. Hayworth on an issue that would do nothing to undermine the charges against the defendant could not have had any effect on the jury's determination.

Appellant's final contention is that the district court erred in its application of the sentencing guidelines. In contrast to the other issues raised on appeal, appellant's objections to the district court's application of the sentencing guidelines are not clearly defined. We discern four primary contentions with regard to the sentence imposed: first, appellant argues that the sentencing judge erred by considering unreliable hearsay evidence; second, that the court erred in determining the offense level based on the conduct of another person (William Gray) and on conduct for which appellant was not indicted; third, that the funds which should be counted to determine the sentence are only those funds used in the unlawful monetary transactions for which he was convicted, not the entire amount of funds collected in the course of the peso scheme; and fourth, that the district court erred in concluding that appellant was a leader or organizer of the criminal activity.

■ Appellant's first argument relates to the consideration of hearsay evidence at the sentencing hearing. Appellant argues that two particular items of evidence that lacked sufficient indicia of reliability were considered by the court in violation of U.S.S.G. § 6A1.3. (*See* § 6A1.3: "[T]he court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.") The first item of evidence was a series of promissory notes introduced by the government. The notes stated that they were between William Gray and Rob-

ert Johnson and ranged in amount from less than one million dollars up to twenty-seven million dollars. The second item was a handwritten letter from the defendant to William Gray. We find no error in the court's consideration of these materials in determining appellant's sentence. To begin with, these items would not even constitute hearsay under the rules of evidence insofar as they were offered to prove that a relationship existed between appellant and William Gray rather than to prove the truth of the assertions in the documents. The letter written by the defendant also would not be considered hearsay insofar as it constituted an admission against interest. *See* Fed.R.Evid. 801(d)(2). At any rate, we find that the items mentioned, which were seized from William Gray upon his arrest, bore sufficient indicia of reliability to warrant their consideration.[8]

Appellant's second and third claims relate to the district court's calculation of the proper offense level. Appellant does not dispute that the district court selected the appropriate base offense level—a level of 23 as provided in U.S.S.G. § 2S1.1. He does contend, however, that the district court incorrectly increased the base offense level by 10 points.[9] The court added the 10 points pursuant to § 2S1.1(b), which states in part: "If the value of the funds exceeded $100,000, increase the level as follows: * * * (K) More than $20,000,000 add 10." The district court determined that more than $20,000,000 was involved in the offense based on evidence indicating that the defendant and his associate, William Gray, took in more than that amount from investors in the fraudulent peso scheme.

▇▇▇ Appellant first contends that he cannot be held accountable for the actions of William Gray. The district court found that the conduct of Gray was appropriately considered under the "relevant conduct" provision of U.S.S.G. § 1B1.3, which provides in part:

**Relevant Conduct (Factors that Determine the Guideline Range**

(a) *Chapters Two (Offense Conduct) and Three (Adjustments).* Unless otherwise specified, ... (ii) specific offense characteristics ... shall be determined on the basis of the following:

(1) all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would otherwise be held accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense;

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction; [and]

(3) all harm that resulted from the acts or omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts or omissions;

. . .

Section 1B1.3 allows the sentencing judge to consider certain conduct outside of the count of conviction in determining an appropriate sentence. In this respect, it bears some similarity to the way in which sentences were determined prior to adoption of the guidelines. Before the guidelines, there was virtually no limitation on the information a sentencing judge could consider in determining an appropriate sentence for the count of conviction. The

---

8. It appears that the government did not delve into the circumstances surrounding the acquisition of the documents because defense counsel indicated that he would stipulate as to the foundation for the documents. Rec.Vol. VII at 14.

9. The defendant's total offense level was 37. This was determined as follows: The base offense level was determined to be 23 under § 2S1.1 and the grouping rules of § 3D1.2(d) and § 3D1.3(b). To this figure the 10 level

increase under § 2S1.1(b)(2)(K) was added, plus a 4 level enhancement for the defendant's role in the offense (§ 3B1.1(a)). The defendant's prior convictions resulted in a criminal history score of 11, which put him in criminal history category V. The resulting guideline range for the defendant was 324–405 months imprisonment. The district court sentenced the defendant to a total of 405 months.

judge could take account of the "real offense" committed by the defendant, including acts outside of the count of conviction as well as acts committed by others in preparation or furtherance of the crime. Section 1B1.3 continues this practice subject to certain limitations.

██ "Relevant conduct" under § 1B1.3(a)(1) includes all acts which the defendant aided and abetted. or for which he would otherwise be held accountable. Section 1B1.3 contemplates that conduct of others acting in concert with the defendant will be factored into the defendant's sentence: "In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant 'would be otherwise accountable' also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." U.S.S.G. § 1B1.3, comment (n. 1). Thus, the fact that the conduct of an individual other than appellant was used in part to increase appellant's sentence is not inconsistent with the guidelines. There was abundant evidence both at trial and at the sentencing to show that William Gray was acting in concert with appellant in operating the peso scheme. *See* Appellee's Br. at 47–48. Similarly, the fact that uncharged acts of wire fraud by appellant were considered by the sentencing judge does not in and of itself contravene the guidelines. Under § 1B1.3, specific offense characteristics are determined on the basis of "all acts and omissions" for which the defendant is otherwise accountable that occurred in preparation for the offense of conviction or that were otherwise in furtherance of that offense, as well as all harm that resulted from such acts or that was the object of such acts. *See* § 1B1.3(a)(1) and (a)(3). The conduct surrounding the fraudulent peso scheme, which gave rise to the funds used in the counts of conviction, could properly be considered "relevant conduct" under this section.

Appellant nevertheless takes issue with the calculation of the amount of funds involved in the offense. The district court, adopting the recommendation in the pre-sentence report, added the twenty million dollars from the peso scheme to the value of the funds used in the money-laundering counts, and then determined the offense level under § 2S1.1 from this aggregated amount. Appellant contends that the offense level should have been determined only from the funds used in the money-laundering counts.

Even though the fraudulent scheme falls within the definition of "relevant conduct," this does not necessarily mean that in calculating the offense level under § 2S1.1 the funds from the peso scheme may simply be added to the funds used in the unlawful monetary transactions. The offense level under § 2S1.1 is based on the value of "the funds." Although not expressly defined in § 2S1.1, "the funds" obviously refer to funds that are used by the defendant in an unlawful monetary transaction. Money obtained from other types of offenses would not ordinarily be added to such funds unless the guidelines directed the court to do so.

While the record is not entirely clear, it appears that the money from the peso scheme and the money from the money-laundering transactions were added together under the authority of § 1B1.3(a)(2) and § 3D1.2(d). Section 1B1.3(a)(2) states that "solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction" are considered relevant conduct. Section 3D1.2(d) directs the court to group together counts falling within its scope into a single group and to determine an offense level for the group by aggregating the harm from all the offenses within the group. § 3D1.3(b).

The funds from the wire fraud and the money-laundering conduct were thus added together based on a conclusion that these offenses were of a character that would require grouping under § 3D1.2(d). This determination involves a legal interpretation of the guidelines that we review de novo. *See United States v. Florentino,*

922 F.2d 1443, 1445 (10th Cir.1990). Section 3D1.2(d) provides that counts shall be grouped "[w]hen the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm...." We therefore turn to the guidelines governing the two types of conduct at issue here to determine whether the funds from those offenses were properly added together. Under § 2F1.1, the guideline that would apply to the wire fraud scheme, the offense level is determined largely on the basis of "the loss" resulting from the fraud. Under the money-laundering guideline, § 2S1.1, the offense level is determined largely on the basis of "the value of the funds."

The offense levels under these two guidelines are not determined on a basis that would require grouping under subsection (d). Although both offense levels are determined from a calculation involving an amount of money, the harm being measured by each is significantly different in character. "Loss" is used throughout the guidelines as a measure of the net harm resulting from theft and property crimes. As applied to the facts here, it would be the actual loss from the fraudulent scheme or the intended loss that the defendant was attempting to inflict from the scheme. § 2F1.1, comment. (n. 7). This determination would require the court to apply the principles for the valuation of loss discussed in the commentary to § 2B1.1. In any given case, the "loss" may or may not be the same as the total amount of funds involved in the fraudulent scheme. *See* U.S.S.G. § 2F1.1. comment (n. 7–10). A determination of loss requires an assessment of the impact of the fraud on the individual victims. Section 2S1.1, on the other hand, is not based on the amount of the loss. It is based on the value of the

funds involved in the laundering transaction. The harm from such a transaction does not generally fall upon an individual but falls upon society in general. Thus, the measure of harm under § 2S1.1 is the total amount of funds involved.

Section 3D1.2(d) was intended to be used when the measurement of harm for one offense is essentially equivalent to the measurement of harm for other related offenses. *See* U.S.S.G. Ch. 1, Pt.A, intro. comment at 8 ("[W]hen the conduct involves fungible items (*e.g.*, separate drug transactions or thefts of money), the amounts are added and the guidelines apply to the total amount"). That is not the case here. We find that offenses falling under these two guidelines would not be grouped together under § 3D1.2(d). *Cf. United States v. Porter,* 909 F.2d 789, 792–93 (4th Cir.1990). As such, it was an incorrect application of § 3D1.2(d) of the guidelines for the district court to determine the offense level by adding the funds obtained from the wire fraud scheme to the funds used by the defendant in the money-laundering offenses.[10] Accordingly, we must vacate the sentence and remand the case to the district court for resentencing.

Appellant's final argument is that the district court erred by increasing the offense level under § 3B1.1(a) based on a finding that appellant was an "organizer or leader" of the criminal activity. This enhancement resulted in a four-level increase to the base offense level. The presentence report makes clear that the enhancement was based on appellant's role as the organizer of the fraudulent peso scheme rather than for his role in the acts constituting the counts of conviction. The presentence report noted that a 1990 amendment to the commentary for § 3B1.1 stated that the

**10.** We express no opinion on whether the total funds from the peso scheme could be used to determine the offense level under § 2S1.1 pursuant to the guideline governing attempts and conspiracies. *See* § 2X1.1. There are no findings in the record before us concerning that issue.

Although we find that § 3D1.2(d) does not authorize the court to add funds associated with

acts of wire fraud to money-laundering funds, we note that funds associated with uncharged instances of money laundering can be added in to determine the offense level under § 2S1.1 if those acts are within the scope of relevant conduct under § 1B1.3(a)(2). Thus, in determining the "value of the funds" under § 2S1.1, the district court is not necessarily limited only to the funds identified with the counts of conviction.

 

role in the offense adjustment should be determined from all relevant conduct.

 In *United States v. Pettit*, 903 F.2d 1336, 1341 (10th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 197, 112 L.Ed.2d 159 (1990), we held that the plain language of § 3B1.1 required the court to focus on the defendant's role in the offense of conviction rather than on other criminal conduct. *See also United States v. Reid*, 911 F.2d 1456, 1464 (10th Cir.1990), ("the defendant's role is considered only in relation to the offense of conviction, we do not look at all to relevant conduct"), *cert. denied*, —— U.S. ——, 111 S.Ct. 990, 112 L.Ed.2d 1074 (1991). Subsequent to *Pettit*, the Sentencing Commission amended the commentary to § 3B1.1 to make clear that the determination of the defendant's role in the offense was to be determined on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct) and not solely on the basis of elements and acts in the counts of conviction. This amendment was effective November 1, 1990. In *United States v. Saucedo*, 950 F.2d 1508 (10th Cir.1991), we determined that the amendment to § 3B1.1 constituted a substantive change in the law and concluded that its application to offenses committed before the date of the amendment would violate the ex post facto clause of the Constitution. Because all of appellant's offenses in this case were committed before the date of this 1990 amendment, the application of the amended version of § 3B1.1 to his offenses is barred by the ex post facto clause. Accordingly, the four-point enhancement of appellant's sentence under § 3B1.1 must be vacated. As to the money-laundering counts for which appellant was convicted, there was no allegation that any other participants took part in those transactions. Thus, no enhancement is appropriate for appellant's role in the offense because § 3B1.1 applies only to offenses committed by more than one participant.

### Conclusion

The convictions on counts two, three, and thirty-two through sixty-three are AF-FIRMED. The convictions on counts four through thirty-one are REVERSED. The sentence is VACATED and the case is remanded to the district court for resentencing in accord with the views expressed herein.