**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                    No. 96-4515

SAMUEL H. MCMAHON, III,
Defendant-Appellant.

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert D. Potter, Senior District Judge.
(CR-95-73-P)

Argued: December 5, 1997

Decided: December 30, 1997

Before LUTTIG and MOTZ, Circuit Judges, and JONES,
United States District Judge for the
Western District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Claire J. Rauscher, Charlotte, North Carolina, for Appel-
lant. Kenneth Michel Smith, Assistant United States Attorney, Char-
lotte, North Carolina, for Appellee. **ON BRIEF:** Mark T. Calloway,
United States Attorney, David A. Brown, Assistant United States
Attorney, Charlotte, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Samuel H. McMahon, III, convicted of multiple offenses, challenges only his sentence. He maintains that the district court misapplied the grouping guideline, or in the alternative, miscalculated his sentence under the money laundering guideline. We affirm.

I.

The facts essential to this appeal are not disputed. In 1985, Samuel H. McMahon became president and one-third owner of Commercial Management Corporation (CMC), a company formed by McMahon's father to manage a group of Days Inn hotels owned by the McMahon family. McMahon's father then formed two limited partnerships, Florida Hotel Properties (FHP) in 1985 and Southeast Hotel Properties (SHP) in 1987, and solicited investments in return for partnership interests. The partnership interests sold for $100,000 each, with a minimum investment of one-half an interest (i.e., $50,000). Loans were also secured on behalf of the partnerships, including $65 million from General Electric Capital Corporation and $35 million from Chrysler Financial. FHP and SHP used the funds to purchase numerous hotels, including some of the hotels owned by McMahon's father. The partnerships then hired CMC to manage the hotel properties.

The partnerships lost significant amounts of money, and by 1989 had lost over $14 million. Thereafter, McMahon began, in the words of the district court, "a pattern of unlawful diversion of partnership funds for his personal benefit and business interests unrelated to the limited partnerships." Between 1990 and 1992, McMahon illegally diverted partnership funds for personal investment, purchase of land, homes and condominiums, an effort to start a NASCAR racing team, purchase of vehicles (including a boat, an airplane and a helicopter), and miscellaneous other expenditures. In connection with these diver-

2

sions, McMahon engaged in a massive strategy of fraud and concealment, including wire transfers, interstate transportation of funds, falsification of records, use of cashier's checks for laundering money, and failure to report income for taxation purposes.

In July 1991, FHP filed for bankruptcy protection, and a month later August SHP was involuntarily placed in bankruptcy. McMahon continued his illegal activities after the institution of the bankruptcy proceedings, and offered false testimony under oath in connection with those proceedings.

On July 11, 1995, a grand jury returned a two-count indictment against McMahon. A superseding indictment was filed on November 17, 1995, charging McMahon with multiple counts of wire fraud in violation of 18 U.S.C. § 1343, interstate transportation of stolen property in violation of 18 U.S.C. § 2314, money laundering in violation of 18 U.S.C. § 1956(a)(1)(B), bankruptcy fraud in violation of 18 U.S.C. § 152, false statements under oath in violation of 18 U.S.C. § 152, engaging in monetary transactions with criminally derived property in violation of 18 U.S.C. § 1957, tax evasion in violation of 26 U.S.C. § 7201, filing a false tax return in violation of 26 U.S.C. § 7206(1), and aiding and abetting the above crimes in violation of 18 U.S.C. § 2. A jury convicted McMahon on all counts.

The United States Probation Office prepared a presentence investigation report (PSR) prior to McMahon's sentencing. The PSR determined that the conduct should be separated into four distinct groups under United States Sentencing Guidelines § 3D1.2 (1997): (1) wire fraud and interstate transportation of stolen monies (pursuant to § 3D1.2(d)); (2) concealment of bankruptcy assets and the offering of false statements under oath (pursuant to § 3D1.2(c)); (3) money laundering and engaging in monetary transactions with criminally derived property (pursuant to § 3D1.2(c)); and (4) tax evasion and the filing of a false tax return. See U. S. Sentencing Guidelines Manual § 3D1.2 (1997) (U.S.S.G.).

The PSR determined that the highest adjusted offense level under the Guidelines was 27, attributable to the third grouping (a base level offense of 20 under U.S.S.G. § 2S1.1(a), plus enhancement of 5 under U.S.S.G. § 2S1.1(b)(2)(F) because the laundered funds exceeded $1

3

million, plus enhancement of 2 under U.S.S.G. § 3B1.3 for abuse of a position of trust in a manner that significantly facilitated commission or concealment). Four additional units were then added to reflect the four offense groups, making the total offense level 31. The PSR concluded that the applicable sentence range was 108 to 135 months imprisonment plus supervised release of two to three years.

McMahon objected to portions of the PSR including the failure to group all counts together. The probation agent then filed an addendum to the PSR, to respond to these objections. The Addendum stated that the designated four separate groups could not be further grouped together because the groups "represent distinctly different harms and victims." On June 26, 1996, the district court held a sentencing hearing, at which the court overruled the objections to the PSR, adopted its findings, and imposed a sentence of 135 months imprisonment, three years supervised release, a mandatory special assessment pursuant to 18 U.S.C. § 3013, and the costs of prosecuting the tax counts.

McMahon appeals his sentence, asserting that it violated the Sentencing Guidelines. We review "a question involving the legal interpretation of Guidelines terminology and the application of that terminology to a particular set of facts de novo ." United States v. Wessells, 936 F.2d 165, 168 (4th Cir. 1991). Factual determinations that underlie the application of the Guidelines are reviewed for clear error. United States v. Daughtrey, 874 F.2d 213, 217-18 (4th Cir. 1989).

II.

Initially, McMahon contends that his criminal conduct constituted a continuous and integrated scheme to defraud the partnerships, and thus the grouping guideline, U.S.S.G. § 3D1.2(d), requires grouping of the conduct into one group rather than four.

As we have previously noted, the policy goals of the grouping guideline are two-fold: first, to "ensure incremental punishment for significant additional criminal conduct"; and second, somewhat in tension with the first, "to limit the significance of the formal charging decision . . . to prevent multiple punishment for substantially identical offense conduct." United States v. Toler, 901 F.2d 399, 402 (4th Cir.

4

1990) (internal quotation marks omitted). Thus, the grouping guideline seeks to assure that "[c]onvictions on multiple counts do not result in a sentence enhancement unless [the multiple counts] represent additional conduct that is not otherwise accounted for by the guidelines." Id. (internal quotation marks omitted; first alteration in the original). We turn, therefore, to examine the provisions of this guideline.

Section 3D1.2 states:

> All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule:
>
> (a) When counts involve the same victim and the same act or transaction.
>
> (b) When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.
>
> (c) When one of the counts embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.
>
> (d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.
>
> Offenses covered by the following guidelines are to be grouped under this subsection: §§ 2B1.1, ... 2F1.1, ... 2S1.1, 2S1.2, ... 2T1.1 ....

U.S.S.G. § 3D1.2 (emphasis added).* Several interpretive points

_____

*The guideline applicable to false statements under oath (Counts 14 and 15) is § 2J1.3. Although this guideline is not specifically listed within § 3D1.2, that section states that in such instances "a case-by-case determination must be made" for grouping purposes. U.S.S.G. § 3D1.2.

5

about this guideline merit mention. First, its purpose "as stated in the lead paragraph [is] to identify and group`counts involving substantially the same harm.'" U.S.S.G. § 3D1.2, comment. (n.2). Under subsection (d), counts involve substantially the same harm when they involve offense behavior that "is ongoing or continuous in nature." Second, the guideline directs that offenses "shall be grouped" when the provisions apply. Grouping, therefore, is not discretionary. Third, the subsections of the guideline provide alternative bases for the grouping of offenses. Thus, "[c]ounts are to be grouped together into a single Group if any one or more of the subsections provide for such grouping." U.S.S.G. § 3D1.2, comment. (n.1) (emphasis added). Fourth, "[s]ubsection (d) will likely be used with the greatest frequency. It provides that most property crimes . . . and other crimes where the guidelines are based primarily on quantity or contemplate continuing behavior are to be grouped together." U.S.S.G. § 3D1.2, comment. (n.6) (emphasis added).

Recently, we have twice considered the possible grouping of money laundering counts with counts involving other offenses. In United States v. Porter, 909 F.2d 789, 792 (4th Cir. 1990), the defendant argued that his money laundering count was"inextricably tied to [his illegal] gambling counts because the money laundered was illegal gambling proceeds," and thus the district court should have grouped the counts for sentencing. In Porter, the defendant had taken his illegal gambling proceeds and purchased a home, which he subsequently sold two years later. That transaction provided the basis for the money laundering count. In rejecting the grouping of the offenses under subsections (a), (b) or (d) of § 3D1.2, we reasoned that

> [o]ne could envision an illegal enterprise which generated monies through illegal gambling activities and simultaneously laundered those monies as part of the same continuing transaction or common scheme. Such is certainly not the case here, however. But for the fact that the home Porter sold was originally purchased with gambling proceeds, this money laundering offense was completely unrelated to the gambling operation. There is no evidence whatsoever that this sale was in any way integrated with the gambling operation or connected to any particular gambling transactions. The single connection offered by [Porter] is thus insufficient

6

> to support a finding that the laundering of the funds used to purchase the house was "closely related" to the gambling operation which generated them. To hold otherwise would mean that every act of money laundering would be closely related to the underlying crime which produced the laundered money.

Id. at 793. Thus, we concluded that § 3D1.2(d) neither categorically required nor categorically prohibited grouping the offenses. Instead, grouping is a case-by-case determination dependent upon whether the offenses involved were part of an ongoing or continuous scheme.

Earlier this year, a panel of this court picked up where Porter left off, finding that a district court properly grouped a defendant's money laundering and mail fraud convictions under § 3D1.2(d). See United States v. Walker, 112 F.3d 163, 167 (4th Cir. 1997). In that case an insurance agent received large sums of money from customers to purchase annuities. Instead of purchasing the annuities, the agent diverted the funds into his own bank accounts. To perpetuate his fraud, the agent sent his customers false documents and used some of the defrauded funds to make false interest payments. He was indicted and pled guilty to mail fraud and money laundering. We reasoned that the agent had "conceded" that the "money laundering was part of his fraudulent scheme," id., by pleading guilty under the portion of the laundering statute which forbids laundering "with the intent to promote the carrying on of [the] specified unlawful activity," 18 U.S.C.A. § 1956(a)(1)(A)(i) (West Supp. 1997).

We find this case closer to Porter than to Walker. Unlike the activities involved in Walker, McMahon's money laundering, tax evasion, false statements, and other offenses, although effective at concealing his fraud, did not serve to perpetuate the fraud. For example, the laundered monies were not plowed back to facilitate additional fraudulent transactions. Like the defendant in Porter, McMahon simply used the fraudulent, laundered funds to indulge his personal whims. The boat purchased with this ill-gotten gain may have kept McMahon afloat, but it did little or nothing to sustain his fraudulent activities.

We cannot conclude that McMahon's offenses constituted an ongoing scheme for purposes of U.S.S.G. § 3D1.2(d). We therefore hold

7

that McMahon's offenses do not involve substantially the same harm as contemplated by § 3D1.2 and that the district court properly refused to consolidate McMahon's offenses into one group rather than four.

III.

Alternatively, MacMahon contends that the district court erred by including certain transactions as "relevant conduct" pursuant to U.S.S.G. § 1B1.3 in order to calculate the amount of funds laundered under the money laundering guideline, U.S.S.G. § 2S1.1.

The district court found, based on schedules prepared by the probation agent from evidence admitted at McMahon's trial, that McMahon illegally laundered over $1.2 million, although he was only charged with laundering approximately $128,000. The district court's factual determination of the value of the funds involved in a money laundering offense is reviewed for clear error. See United States v. Tansley, 986 F.2d 880, 884 (5th Cir. 1993).

McMahon asserts that the charged money laundering offenses only included conduct surrounding his bankruptcy fraud, and thus "[t]he money laundering amounts should be reduced to reflect only that conduct." Brief of Appellant at 23. Moreover, McMahon contends that by considering dollar amounts also included in other offense groups the district court engaged in impermissible double-counting. We find no merit to McMahon's argument.

The value of the funds laundered is a specific offense characteristic of the money laundering offense. See U.S.S.G. § 2S1.1(b). Specific offense characteristics are determined by reference to all "relevant conduct" not just the offenses for which a defendant is convicted. Thus, in determining what conduct is relevant for sentencing purposes, a sentencing court need not confine itself to conduct or quantities specified in the counts of conviction. See United States v. Mark, 943 F.2d 444, 450 (4th Cir. 1991). Section 1B1.3 of the guidelines defines relevant conduct as

> all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the

8

> defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense . . . [and] all harm that resulted from the acts and omissions . . . and all harm that was the object of such acts and omissions.

U.S.S.G. § 1B1.3(a)(1) and (3). Thus, "relevant conduct" includes all conduct related to the charge that occurred before, during, or after the offense, and even criminal conduct not charged.

We note that the commentary to the section indicates that when, as here, § 3D1.2(d), the grouping guideline,"does not apply, so that convictions on multiple counts are considered separately in determining the guideline sentencing range, the guidelines prohibit aggregation of quantities from other counts in order to prevent`double counting' of the conduct and harm from each count of conviction." U.S.S.G. § 1B1.3, comment. (backg'd). However, this simply means that funds solely involved in one group of counts in a multi-count indictment cannot be included as relevant conduct with regard to another group of counts in that indictment. This comment does not prohibit funds involved in several groups of counts from being regarded as relevant conduct as to each of those groups of counts. See United States v. Johnson, 971 F.2d 562, 576 n.10 (10th Cir. 1992) (noting that, while funds attributable to only wire fraud could not simply be aggregated with money laundering funds, funds associated with uncharged instances of money laundering may be included as relevant conduct in determining the money laundering offense level).

The district court did not err in determining McMahon's offense level under § 2S1.1.

IV.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

9