UNITED STATES of America,
Plaintiff–Appellee,

v.

Steven Lynn GRIFFITH, Defendant–Appellant.

No. 93–5373.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 12, 1993.

Decided Feb. 28, 1994.

Joseph M. Whittle, Terry Cushing (argued) and Alan E. Sears (briefed), Asst. U.S. Attys., Office of the U.S. Atty., Louisville, KY, for plaintiff-appellee.

Mark A. Smedal, John L. Smith (argued and briefed), John H. Harralson, III (briefed), Alagia, Day, Trautwein & Smith, Louisville, KY, Julian M. Carroll, Frankfort, KY and Charles B. Lembcke (argued), Datz, Jacobson, Lembcke & Garfinkle, Jacksonville, FL, for defendant-appellant.

Before: GUY and RYAN, Circuit Judges; and MILES, Senior District Judge.*

RYAN, Circuit Judge.

Steven Lynn Griffith appeals his conviction for conspiracy to commit wire fraud, mail fraud, and interstate transportation of property obtained by fraud; and for substantive counts of wire fraud; mail fraud; interstate transportation of property taken by fraud; bankruptcy fraud; and money laundering. He also challenges the district court's failure to grant a mistrial based on alleged juror misconduct and appeals the sentence imposed.

We must answer five questions: (1) Was there sufficient evidence to support the defendant's convictions for wire and mail fraud and transportation of fraudulently obtained goods, pursuant to 18 U.S.C. §§ 1341, 1343, and 2314; (2) did the government properly aggregate shipments into a single violation of interstate transportation of goods taken by fraud, pursuant to 18 U.S.C. § 2314; (3) was the inventory obtained through the defendant's fraud "criminally derived property" for purposes of the money laundering statute, 18 U.S.C. § 1957; (4) did the district court abuse its discretion in failing to hold a more comprehensive hearing on potential juror misconduct; and (5) did the district court err in sentencing the defendant by imposing a supervisory role increase, and by rejecting

---

* The Honorable Wendell A. Miles, Senior United States District Judge for the Western District of Michigan, sitting by designation.

his self-rehabilitation as a basis for a downward departure.

In addition, the defendant challenges, on jurisdictional grounds, his conviction on four counts charging interstate shipment of property obtained by fraud.

We affirm all the challenged convictions except the four counts challenged on jurisdictional grounds and we affirm the sentence, with minor exceptions.

## I.

In the early 1980's, the defendant, Steven Griffith, entered into a business partnership with Terry Lea Griffith, his former and present wife.[1] The business revolved around credit sales of photographic equipment and film processing, and was operated under several names, including S & T Photo, Photo Mart, and Griffith Acceptance which handled the chattel paper created by the sales contracts. All of the businesses were headquartered in Paducah, Kentucky.

Terry Griffith was primarily responsible for handling the books, and the defendant handled organizational and sales responsibilities. The partnership did approximately $1.36 million in gross sales in 1985, and $1.16 million in 1986.

Things began to change, however, in 1987. The partnership closed down distributorships in sales territories that had "run dry." Gross sales for 1987 plummeted by more than one-third, to less than $800,000. At about the same time, the Griffiths' primary lender, Bank of Paducah, called in the partnership's $550,000 credit line. In the last quarter of 1987, the defendant and Terry Griffith agreed to the bulk sale of the partnership's commercial paper, to reduce outstanding indebtedness to $185,500. In addition, the Griffiths agreed to convert the partnership's balance to long-term debt.

In the meantime, the partnership was branching out. In January 1988, the defendant and Terry Griffith met Joseph Salamon, a manufacturers' representative who sold primarily to home shopping networks and mail order companies. En route to a consumer electronics show in Las Vegas, the Griffiths told Salamon that "they were in direct ... marketing of goods to consumers on a door-to-door basis and that they also were acting as a distributor for certain companies or manufactures [sic]." During the course of the conversation, the defendant mentioned that he might have some merchandise for sale.

Later that month, the defendant told Salamon that he was interested in selling 100 Fuji 35-millimeter cameras of a recently discontinued vintage. The defendant also told Salamon he would like to sell a large number of VCRs, perhaps as many as 1,000 units. Salamon subsequently arranged to sell the cameras to a home shopping network.

At about the same time the defendant was negotiating with Salamon, the partnership was stepping up its ordering activity. On January 26, 1988, the Griffiths telephoned a $47,000 order to Fuji Photo Film, U.S.A., for 300 Fuji AX-Multi-Program cameras with lenses and auto winders. In addition, Fuji received a February 25, 1988 letter from Terry Griffith advising that Photo Mart was expanding its product line and would be using Fuji as a credit reference. Terry Griffith wrote a similar letter to another creditor, Symphonic Corporation, and requested an additional credit line of $25,000, based on Photo Mart's projected need for monthly shipments of 125 VCRs. The Griffiths also contacted Kalimar, Inc., another established creditor, to request an increased credit line, and opened lines of credit with Elmo Manufacturing Corporation, Minolta Corporation, Yashica, Inc., Canon, U.S.A., Sansui, U.S.A., Chinon America, Inc., Ansco Photo Optical Products, Regency Electronics, Inc., Vivitar Corporation, Hart Distributing, and Major Distributing.

Dun & Bradstreet reporter William Harlow telephoned the defendant on March 4, 1988, for an annual financial performance update. Despite his knowledge of the partnership's poor 1987 financial condition, the

---

1. The defendant and Terry Griffith divorced in 1978, and remarried after both were indicted, but before proceeding to trial.

defendant informed Harlow that the partnership's 1987 gross sales exceeded previous years, totalling almost $2 million. Harlow was careful to obtain the requisite identifying information to ensure that he was talking to the defendant, and even called the defendant a second time to verify that the defendant had provided actual, rather than estimated, figures.

In addition to the defendant's misrepresentations to Harlow, the partnership took other steps to conceal its dismal financial picture. For example, along with its credit applications, the partnership forwarded outdated impressive 1986 financial statements, even though the defendant had possession of more recent, and much more ominous, financial reports. When a Minolta credit representative requested updated financial information, the defendant promised to send the more current statement within two weeks, but never did so. Even though by April 1, 1988, the partnership had stopped paying its inventory creditors and the dunning had started, the Griffiths continued to open new inventory accounts through at least April 8, 1988, and attempted to place inventory orders through May 20, 1988.

Meanwhile, in March and April 1988, the defendant was selling Symphonic VCRs in bulk to a home shopping network in Newport, Tennessee, at below-wholesale prices. He was also conducting business with Glen Ladenheim, sales manager for Mason Camera in New York. Ladenheim's "specialty [wa]s to try and find closeouts from major manufacturers or retailers, to buy them at favorable price[s] and resell them." Ladenheim, who had heard about the Griffiths from Salamon, called the defendant to ask if he had any merchandise to sell. The defendant responded that he was willing to sell cameras, VCRs, camcorders, and other merchandise. By April 5, 1988, Ladenheim and the defendant had negotiated the first of many deals, with the defendant agreeing to sell Ladenheim 200 of the Fuji camera kits that the partnership had purchased two months earlier. Ladenheim's cost was only $125 per unit, more than $40 below unit wholesale price. In payment, Ladenheim wire transferred more than $25,000 to a Photo Mart account at Peoples First National Bank in Paducah.

The Peoples account was one of several secret bank accounts opened by the defendant and Terry Griffith in April and May 1988. A subsequent wire transfer from Mason, in the amount of $40,000, provided additional funding for the Peoples account. This deposit was in partial payment for a $140,000 transfer of merchandise, which included more than 350 VCRs and 100–plus camcorders of various makes and models. The defendant personally made more than $25,000 in cash withdrawals from this account. In addition, Terry Griffith made cash withdrawals totalling $40,000 before closing the account in July 1988.

On April 26, 1988, the partners opened a second secret account, this one with City Bank of Carbondale, Illinois. Mason Camera made wire transfers totalling over $120,000 to this account in payment for large quantities of Fuji and other cameras, zoom lenses, camera bags, VCRs, microwave ovens, cordless telephones, and other items. The defendant personally withdrew more than $40,000 in cash from this account, and Terry Griffith made cash withdrawals totalling $80,000.

During May 1988, the partners opened similar accounts with King City Savings Bank and Peoples Bank, both in Marion, Illinois, and with City National Bank of Metropolis, Illinois. As with the first two accounts, these accounts received large cash infusions from below-wholesale purchasers, and were depleted by the Griffiths' cash withdrawals.

In the midst of these surreptitious financial transactions, on May 3, 1988, the defendant contracted with Lyon Van Lines to move his household goods from the home in Paducah, Kentucky, he shared with Terry Griffith, to Orlando, Florida. Their personal effects left Paducah on May 10, 1988. Three days later, the Griffiths informed their employees they were closing the business for a one-month vacation, posted a sign and recorded a telephone message to that effect, and locked up the office. Shortly thereafter, an Elmo Manufacturing sales representative, sent to collect Elmo's overdue invoice, photographed a man and a woman transferring

merchandise from the defendant's office into a trailer and van.

Following the Griffiths' relocation to Florida, Major Distributing, the partnership's newest creditor, filed an affidavit with the local authorities seeking the arrests of the defendant and Terry Griffith, for theft by deception. The Griffiths had acquired over $22,000 worth of VCRs, big screen televisions, and camcorders from Major Distributing since opening an account in April 1988, and had made no payments on the account. When the defendant learned of the outstanding warrants in July 1988, he telephoned Major Distributing and offered to pay $15,000 if the creditor would agree to release the warrants. Major Distributing did so after receiving three cashier's checks totalling almost $23,000, bearing the names of apparently fictitious purchasers.

In September 1988, the Griffiths filed a petition in the United States Bankruptcy Court, Western District of Kentucky, seeking voluntary bankruptcy protection and the discharge of over $1.5 million in unsecured debt. Subsequently, the defendant was indicted by a grand jury on 32 separate counts, pursuant to a superseding indictment. The defendant and Terry Griffith were tried by a jury. The jury returned a guilty verdict against the defendant on 28 counts, and the defendant subsequently was sentenced to 37 months' imprisonment and two years' supervised release on each count, all sentences to be served concurrently. The district court also ordered the defendant to make restitution amounting to almost $850,000 to unpaid creditors. This appeal followed.

## II.

### A.

■ The defendant challenges the sufficiency of the government's evidence on his convictions for interstate transportation of fraudulently obtained goods and wire and mail fraud. In reviewing a claim of insufficient evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Moreover, "[i]t has long been recognized ... that circumstantial evidence ... can be sufficient to support a jury's determination...." *United States v. Scruggs,* 549 F.2d 1097, 1104 (6th Cir.), *cert. denied,* 434 U.S. 824, 98 S.Ct. 70, 54 L.Ed.2d 81 (1977).

### B.

The defendant claims that the government produced no evidence that his sale to Mason Camera of 200 Fuji cameras (count 25) constituted interstate transportation of fraudulently obtained goods. Specifically, the defendant argues that there was no evidence of the defendant's fraudulent intent in procuring the cameras, nor any evidence that Fuji detrimentally relied on any misrepresentations in filling the January 1988 camera order. In addition, the defendant maintains that the government failed to prove that the cameras the defendant sold to Mason were part of the January 1988 order.

■ At the time of the defendant's alleged acts, 18 U.S.C. § 2314 prohibited the "transport[ation] in interstate ... commerce of any goods ... of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud." *Id.* Thus, the elements the government had to prove to establish a violation of section 2314 were:

> (1) transporting, or causing the transportation, (2) in interstate commerce, (3) of property valued at $5,000 or more, (4) with knowledge that it has been stolen, converted, or fraudulently taken from its rightful owner.

*United States v. Weiner,* 755 F.Supp. 748, 752 (E.D.Mich.1991), *aff'd,* 988 F.2d 629 (6th Cir.), *cert. denied,* ―― U.S. ――, 114 S.Ct. 142, 126 L.Ed.2d 105 (1993). The government's purely circumstantial proof of the defendant's fraudulent intent is sufficient to sustain a conviction under section 2314. *United States v. Thomas,* 728 F.2d 313, 321–22 (6th Cir.1984).

■ We conclude that there was ample circumstantial evidence of the defendant's fraud to sustain a conviction under 18 U.S.C.

§ 2314. First, it is undisputed that the defendant arranged the sale to Mason, thus causing the interstate transportation of the cameras from Kentucky to Mason's New York headquarters. Second, even at bulk sale prices, Mason paid far in excess of the $5,000 jurisdictional minimum required under section 2314. As to the final element of the crime, the defendant's knowledge, the uncontroverted evidence showed that the defendant had known at least as early as fall 1987 that his business had inadequate financial resources to cover the partnership's buying spree. In October 1987, he was forced to pay down the partnership's bank credit line by almost two-thirds, and to convert the remaining balance to installment debt. No later than mid-December 1987, the partnership's accounting firm notified the defendant that gross sales for the third quarter were down by nearly fifty percent. Moreover, the defendant was well aware that the partnership had been closing down distributorships throughout 1987.

The jury also heard Salamon's testimony that two or three weeks before placing the order with Fuji, the defendant represented himself as a distributor, and asked Salamon to sell some of the partnership's inventory in bulk. Salamon also testified that he and the defendant discussed the bulk sale of other Fuji cameras on or around the exact date that Photo Mart placed the January 1988 Fuji order.

Moreover, as Fuji's credit manager testified, Photo Mart had ordered in high volumes in 1985 and 1986, but not during 1987. It was not until January 26, 1988, that Fuji received the large camera order from Photo Mart at issue here. The grossly disproportionate size of the order in relation to other orders and to Photo Mart's decreased business base, coupled with the fact that the order was placed simultaneous with the defendant's negotiations with Salamon for the bulk disposal of cameras, provide more than sufficient evidence to sustain the defendant's conviction.

■ The defendant's further contentions also are without merit. The defendant first claims that Fuji did not rely on any misrepresentations in filling the January 26 order. Detrimental reliance is not an element necessary to prove a violation of section 2314, but even if it were, the Fuji representative testified at trial that the creditor's attempts to keep the partnership's credit file up-to-date were ongoing. Certainly, Fuji was entitled to rely on the partnership to place legitimate orders against that credit line, and to pay its debt according to the parties' original agreement.

■ The defendant's final claim that the government did not adequately match the cameras in the January 1988 order to the Mason sale is equally unconvincing. The 300 cameras ordered in January 1988 were Fuji AX–Multi–Program cameras with kits, a *new* model designed to replace the discontinued FLR camera. Mason's sales manager confirmed that the new model camera identified on Fuji's January 1988 invoice was the same model purchased from the defendant by Mason. Photo Mart's invoice to Mason further verifies that the cameras purchased from Fuji in January 1988, and those sold to Mason at a bargain basement price, are one and the same. Given this evidence, the jury was entitled to conclude that the defendant purchased the new model cameras in January 1988, intending to ignore his obligation to Fuji, dispose of the cameras in bulk, and pocket the proceeds.

### C.

The defendant claims that the wire and mail fraud convictions must be set aside because there was no evidence that the United States mail was used, or that the alleged telephone calls were interstate, or that the subject mailings and telephone calls were part of a scheme to defraud, or in fact succeeded in defrauding.

As provided by federal law,

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining ... property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire ... in interstate ... commerce, any ... signs, signals ... or sounds for the purpose of executing such scheme or artifice, shall be

874

fined not more than $1,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1343. The federal statute prohibiting mail fraud parallels section 1343. *See* 18 U.S.C. § 1341.

■ The government establishes a violation of the mail fraud statute by "prov[ing] both (1) a scheme to defraud, and (2) a mailing for the purpose of executing the scheme." *United States v. Bibby,* 752 F.2d 1116, 1125 (6th Cir.1985), *cert. denied,* 475 U.S. 1010, 106 S.Ct. 1183, 89 L.Ed.2d 300 (1986). A wire fraud violation "requires a showing of essentially the same things, the only difference being that a wire communication ... is required instead of a mailing." *Id.* at 1126. Furthermore, the defendant himself does not have to use the mails or interstate telephone lines, provided it is foreseeable that the mails or wire services could be used to further his scheme. *United States v. Campbell,* 845 F.2d 1374, 1382 (6th Cir.), *cert. denied,* 488 U.S. 908, 109 S.Ct. 259, 102 L.Ed.2d 248 (1988).

■ The mailing or the telephone call will be in furtherance of the scheme to defraud if it meets the foreseeability requirement and is " 'closely related to the scheme.' " *United States v. Oldfield,* 859 F.2d 392, 400 (6th Cir.1988) (citations omitted). As long as the fraudulent scheme has not been put to ultimate rest, the communication " 'will support a conviction even if it follows the defendant's fraudulent acts, or occurs after the schemers have obtained the victim's money or goods.' " *Id.* (citation omitted). Thus, "[m]ailings occurring after receipt of the goods obtained by fraud are within the statute if they 'were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place.' " *United States v. Lane,* 474 U.S. 438, 451–52, 106 S.Ct. 725, 733, 88 L.Ed.2d 814 (1986) (citation omitted). This "lulling theory" applies equally to wire fraud convictions. *United States v. O'Connor,* 874 F.2d 483, 486 (7th Cir.1989).

■ Proof that a letter was mailed or an interstate telephone call was made can be entirely by circumstantial evidence. For example, as several other circuits have concluded, testimony as to a company's routine use of the postal service is sufficient evidence on its own to establish the mailing requirement. *See, e.g., United States v. Metallo,* 908 F.2d 795, 798 (10th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 1483, 117 L.Ed.2d 625 (1992). Because, in reviewing the sufficiency of the evidence, the court "must credit every inference that could have been drawn in the government's favor," the prosecutor need not negate every other delivery means as to the document in question. *United States v. Sumnicht,* 823 F.2d 13, 15 (2d Cir.1987).

■ We conclude that there is sufficient evidence of the defendant's scheme to defraud to support all convictions for wire and mail fraud. The defendant and Terry Griffith adopted wholesale a scheme to defraud of the kind that we encountered in *United States v. Demetre,* 461 F.2d 971 (6th Cir. 1972). They placed orders far in excess of their ability to pay, then sold the goods in bulk, at or below cost, and diverted the proceeds to secret bank accounts before petitioning for bankruptcy. Accordingly, there was sufficient evidence from which the jury reasonably could conclude that the defendant devised a scheme to defraud the partnership's creditors.

■ As to the evidence of a communication in furtherance of each of the wire and mail fraud counts, there is no requirement that the government produce direct proof in the form of telephone bills or the actual postmarked envelopes. If the government's circumstantial evidence will permit a reasonable inference that parties to a telephone conversation were located in different states at the time of the call, or that a document was transmitted by the United States Postal Service, there is substantial evidence to support the conviction. Thus, in most cases, a witness's testimony that he placed a telephone call to or received a call from an individual in another state will support the inference of the requisite interstate wire communication. Similarly, a witness's testimony that he mailed or received a document in the mail, or that his company routinely

posts and receives documents through the mail, will suffice.

### Wire Fraud Counts 2 through 9

 Count 2 alleges that the defendant committed wire fraud on Symphonic. At trial, Symphonic credit manager Pam Sierra testified to several telephone conversations she had with Terry Griffith during the spring of 1988. Sierra, who was located in New Jersey, testified that she made the calls to Kentucky, and noted these calls on her customer call sheet. The call sheet verified at least two "lulling" conversations between Terry Griffith and Sierra in April 1988, which clearly were attributable to the defendant by virtue of his and Terry Griffith's shared scheme to defraud. See United States v. Conte, 349 F.2d 304, 306 (6th Cir.), cert. denied, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965). Terry Griffith's assurances of payments that were never forthcoming furthered the scheme by providing Symphonic with a "false sense of security," Lane, 474 U.S. at 451, 106 S.Ct. at 733, thereby postponing any premature interference with the scheme. Accordingly, there was sufficient evidence to sustain the defendant's conviction on count 2.

 Count 3 of the indictment charges the defendant with wire fraud on Kalimar, a Missouri-based distributor. Kalimar's credit manager Arthur Duy testified that the defendant telephoned Duy on January 20, 1988, and informed Duy that the Griffiths were changing the business's name from S & T Photo to Photo Mart. As a result of this and follow-up calls, Duy forwarded a new credit application requesting financial references. In addition, Duy testified to a telephone order placed by either the defendant or Terry Griffith on March 21, 1988. Finally, Duy telephoned Photo Mart's Paducah office on May 23, 1988, only to get a recording that Photo Mart was closed for vacation.

This evidence clearly is sufficient to sustain the convictions. The May 23 telephone call from Kalimar to Photo Mart's Kentucky office, which the defendant admits was an interstate call, was as much a lulling call as Terry Griffith's representations to Symphonic that "the check was in the mail." The

scheme had not come to an end when Duy made the call; indeed, the defendants were still dipping into their secret bank accounts to withdraw the proceeds of their scheme until at least mid-July 1988.

Moreover, Duy dutifully telephoned Photo Mart's financial references, in Illinois, New Jersey, and California. Because count 3 incorporates that portion of the conspiracy count that alleges the defendant's provision of financial references as a part of the scheme to defraud, these telephone calls, which were undoubtedly foreseeable to the defendant, are an additional basis for sustaining the conviction.

 The defendant further argues that Kalimar did not extend credit to Photo Mart in reliance on any misrepresentations, because the defendant's partnership was an established Kalimar customer. The defendant overlooks the fact that detrimental reliance is not one of the two elements of wire fraud. See Bibby, 752 F.2d at 1126. Accordingly, there is more than sufficient evidence to sustain the defendant's conviction on count 3.

In count 4, the defendant is charged with wire fraud on Yashica, headquartered in Illinois. Yashica credit analyst Nanette Albail testified to two telephone orders, one placed by Terry Griffith on March 24, 1988, and the second in April 1988, source unknown. The jury was entitled to conclude that at least the March 24 telephone order was placed from Paducah, given that there was no evidence that Terry Griffith conducted business from any place other than the partnership's headquarters.

 Count 5 charges the defendant with wire fraud on Autco, a distributor based in Missouri. At trial, Autco's president, Bruce Dole, testified that he personally called Terry Griffith when an abnormally large Photo Mart telephone order came across his desk on March 28, 1988. Terry Griffith explained to Dole that Photo Mart was expanding, and needed the inventory right away for an upcoming sales event. The jury reasonably could infer that Dole's March 28 telephone call to Terry Griffith was an interstate call. Dole testified that he placed the call when

the order came "across [his] desk," which was in Missouri. The only telephone number on the Photo Mart paperwork was a Kentucky number.

Counts 6 and 7 allege that the defendant engaged in wire fraud as to Hart Distributing by causing wire communications between Hart in Kentucky and Fuji Photo in Illinois (count 6), and Symphonic in New Jersey (count 7). At trial, Thomas Haury, a Hart salesman, testified that the Griffiths first applied to Hart for credit in March or April of 1988. Hart president Hal Bennett, testified that, in connection with this credit application, Photo Mart provided Fuji and Symphonic as references, along with their respective phone numbers and addresses. Bennett further testified that it was normal business practice for Hart to contact all references by telephone. In addition, Hart's business records would have reflected any deviations from normal practice. Thus, absent evidence that the company departed from usual practice on this particular occasion, the jury was entitled to infer that Hart followed its routine practice of telephoning Fuji and Symphonic.

■ Count 8 charges the defendant with wire fraud on Elmo Manufacturing, based in New York. As Elmo president Vincent Marotti testified, Terry Griffith telephoned the company's order desk on March 16, 1988, and ordered 100 camcorders. Again, given Elmo's New York location, and Terry Griffith's usual presence at her office in Kentucky, the jury was entitled to find that this telephone call was interstate in nature.

In count 9, the defendant is charged with wire fraud on Fuji Photo. Linda Lortz, credit manager for Fuji, testified to the interstate nature of several telephone orders, beginning with the January 26, 1988 order for 300 cameras. At least some of the calls to New York were made by the Griffiths. In addition, Lortz testified to numerous lulling conversations she had with Terry Griffith, all of which were by·interstate telephone wires. Accordingly, sufficient evidence sustains the defendant's conviction on count 9.

### Mail Fraud Counts 10–11, 13 through 19

■ Count 10 of the indictment charged the defendant with mail fraud on Regency Electronics. Regency assistant treasurer William Atkins testified that the partnership's February 1988 credit application, signed by the defendant, "came in the mail." In addition, Atkins testified that Regency checked the partnership's credit references by mail. His testimony was buttressed by multiple date stamps on the credit checks, showing the creditor's date of receipt, then the date of return to Regency. In addition, as to one document transmitted by facsimile, a notation to that effect was made on the record, and the document clearly bore the electronically imposed legend common to such documents. From this evidence, the jury was entitled to find that the defendant used the United States mail to obtain credit at a time when his scheme was in full force. Accordingly, there was substantial evidence to sustain the defendant's conviction on count 10.

In count 11, the defendant is charged with mail fraud on Canon, U.S.A. The trial testimony of Canon representative William Monstvil paralleled that of the Regency witness. The Griffiths' February 1988 credit application was received by Canon through the mail, and Canon used the mail to send credit inquiries and receive responses. The documents bear multiple date stamps. As with Regency, the jury reasonably could infer that the documents travelled through the Postal Service.

Count 13 alleges that the defendant committed mail fraud on Hart Distributing. Hart salesman Haury testified that he mailed the Griffiths a credit application at their request. Hart president Bennett testified that Hart received the credit application through the mail, and that Hart's credit office used the mail to send a credit inquiry to Paducah Bank.

Count 14 charges the defendant with mail fraud on Vivitar Corporation. Vivitar credit director Howard Nista testified that the Griffiths submitted their March 1988 credit application by mail. He testified that credit references all were checked by mail. The documents bore multiple date stamps. In con-

trast, he identified one document, a Photo Mart order, that he hand-carried from a trade show in Chicago back to the Vivitar offices.

In count 15, the defendant is charged with mail fraud on Chinon America. Patrick Petrocelli testified on Chinon's behalf that the company used the mail to send out credit inquiries on Photo Mart. In addition, Petrocelli testified that in February 1988, the Griffiths forwarded financial information through the mail in response to Chinon's request. The outdated nature of this information prompted Chinon's use of the mails to request a more current financial statement.

In count 16, the defendant is charged with mail fraud on Sansui, U.S.A. At the Griffiths' request, Sansui mailed a credit application to Photo Mart, which Terry Griffith signed on March 31, 1988, and forwarded by return mail.

Count 17 charges the defendant with mail fraud on Minolta Corporation. Mary Fisher Hasenberg, testifying for Minolta, stated that, in follow-up to a telephone conversation with the defendant, Minolta forwarded a personal guarantee and a request for more current financial information. Minolta held shipment of an order pending receipt of the executed guarantee, which the Griffiths returned by mail.

Count 18 charges the defendant with mail fraud on Elmo Manufacturing. Witness Marotti, on Elmo's behalf, testified to receiving in the mail a March 15, 1988 letter from Terry Griffith, requesting that Elmo open a Photo Mart credit line "as soon as possible." Enclosed with the letter was a credit history on Photo Mart, including references.

Finally, count 19 alleges that the defendant committed mail fraud on Fuji Photo. Fuji's witness, Lortz, testified to receiving the Griffiths' letter alerting Fuji that it would be receiving many credit inquiries on Photo Mart. Lortz testified that the February 25, 1988 letter was received by Fuji on February 29, 1988. In addition, Fuji mailed a March 28, 1988 credit inquiry to Paducah Bank, which the bank completed and signed on March 31, 1988, and returned by mail. A copy of one envelope postmarked in Paducah was entered into evidence. From Lortz's testimony, confirmed by the exhibits, the jury was entitled to conclude that the defendant and Terry Griffith used the United States mail and caused others to use it in furtherance of their fraudulent scheme.

Accordingly, there was sufficient evidence to sustain the defendant's convictions on all mail fraud counts.

### III.

#### A.

The defendant challenges his convictions for interstate shipment of property obtained by fraud (counts 20 through 23) on jurisdictional grounds. He claims that the government improperly calculated the value of the transferred goods using retail rather than wholesale value. *See United States v. Cummings,* 798 F.2d 413, 416 (10th Cir.1986). The government concedes that, properly calculated, the value of each shipment was less than the jurisdictional limit set forth in 18 U.S.C. § 2314. Therefore, the convictions on those counts must be set aside.

#### B.

The defendant challenges his conviction on count 28, interstate transportation of fraudulently obtained goods, by arguing that one shipment of goods cannot be combined with another shipment to establish the jurisdictional requirements of 18 U.S.C. § 2314. We review "[w]hether aggregation is proper or not ... under a 'clearly erroneous' standard...." *United States v. Martin,* 800 F.2d 560, 562 (6th Cir.1986).

It is established that, in order to meet the jurisdictional requirements of section 2314, aggregation of a number of shipments to the same recipient is permissible. *Schaffer v. United States,* 362 U.S. 511, 517–18, 80 S.Ct. 945, 949, 4 L.Ed.2d 921 (1960). Applying *Schaffer,* we have held that the aggregation of two checks was proper where the checks were drawn on the same account to the same payee and written within eight days of each other. *Martin,* 800 F.2d at 562. Similarly, the shipments here were to the same recipient, were billed on the same in-

voice, and were shipped within four or five days of each other. Accordingly, we find that the government properly aggregated the two shipments.

■ Moreover, in response to other challenges raised by the defendant, there was sufficient evidence that well over $5,000 worth of goods contained in the shipment were obtained by fraud. As the Mason representative testified, included in the shipment were 47 Elmo camcorders. These camcorders, part of the partnership's only Elmo order, carried a wholesale value of over $58,000. Accordingly, the jurisdictional requirements of section 2314 were satisfied.

## C.

The defendant challenges his convictions on the money laundering counts (counts 31 and 32) on the theory that the criminally derived property element of money laundering cannot also be an essential element of the crime underlying the money laundering counts. The defendant contends that, because the criminally derived property—the inventory sold to Mason—was also an element of the underlying crime of interstate transportation of fraudulently obtained property, his conviction cannot stand. In addition, the defendant maintains that the jury was misinstructed on the elements of money laundering.

■ Whether the fraudulently obtained inventory can constitute "criminally derived property" is a question of law. Therefore, we shall apply a *de novo* standard of review. *United States v. Breitkreutz,* 977 F.2d 214, 221 (6th Cir.1992). As to the challenged jury instruction, we should uphold it provided " 'the charge, taken as a whole, fairly and adequately submits the issues and applicable law to the jury.' " *United States v. Buckley,* 934 F.2d 84, 87 (6th Cir.1991) (citation omitted).

The federal money laundering statute provides, in pertinent part:

> Whoever ... knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is

derived from specified unlawful activity, shall be punished....

18 U.S.C. § 1957(a). For purposes of the statute, "criminally derived property" is defined as "any property constituting ... proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2).

The defendant points out that, in *United States v. Johnson,* 971 F.2d 562 (10th Cir. 1992), the Tenth Circuit reversed a defendant's conviction for money laundering because the alleged "criminally derived property," wire transfers to the defendant, *was* the underlying criminal activity, wire fraud. *Id.* at 569–70. As the court explained:

> The underlying criminal activity in this case was wire fraud, which the defendant accomplished by causing the investors to wire funds to his account. Whether or not the funds that were wired to the defendant were "criminally derived property" depends upon whether they were proceeds obtained from a criminal offense at the time the defendant engaged in the monetary transaction. We find they were not. Section 1957 appears to be drafted to proscribe certain transactions in proceeds that have already been obtained by an individual from an underlying criminal offense. The defendant did not have possession of the funds nor were they at his disposal until the investors transferred them to him.

*Id.* (footnote omitted).

We find the defendant's point of error without merit. We do not think the holding announced in *Johnson* should be applied beyond its limited context. Here, the money laundering counts incorporate counts 25 and 28, which charge interstate transportation of fraudulently obtained property, in violation of 18 U.S.C. § 2314. As we have stated, to establish a violation of section 2314, the government must prove (1) interstate (2) transportation of (3) at least $5,000 in property (4) that the defendant knew was stolen or taken by fraud. Thus, while property of a minimum value is an element of the crime, it hardly can be characterized as the *corpus delicti,* as is the wire transfer or telephone call aspect of wire fraud.

Moreover, the *Johnson* holding does not apply to the facts of this case for another reason. Counts 25 and 28 incorporate the defendant's conspiracy to commit wire and mail fraud. Unlike the situation in *Johnson*, the criminally derived property—the inventory obtained through the defendant's wire and mail fraud—clearly was within the defendant's control before he engaged in the charged section 1957 violations—the sale of the inventory to Mason.

The defendant's challenge to the jury instruction also must fail. The defendant complains that the instruction is misleading because it "fails to disclose that the crime of money laundering does not exist when the wire transfer alleged in the Indictment is a part of the underlying crime." We reject the defendant's challenge. The wire transfers alleged in counts 31 and 32 of the indictment—Mason's payments to the defendant for the fraudulently obtained inventory—were in no way an essential part of his violations of 18 U.S.C. §§ 1341, 1343, or 2314.

### D.

The defendant's final challenge to his conviction is based on his contention that juror misconduct tainted his trial. After closing arguments, as the court clerk excused two alternate jurors from deliberating, one of the alternates, juror Forsythe, objected. Forsythe told the court that another juror had provided her with transportation, and she willingly would switch with any juror who would like to be excused. The court denied her request.

As the jury deliberated, the trial judge notified the parties' lawyers that he had information that Forsythe had attempted to discuss the case with a deputy marshal. The judge told the attorneys that he intended to have her taken home. The judge then asked,

> Knowing those facts, does anybody not concur?

> One thing in this case, I think all of you wanted a just and lawful trial and that's all that anybody's asked for and I've told you

all I know. I could inquire further, I could—

All attorneys responded in the negative.

A few hours later, defense counsel raised the Forsythe issue again. He stated that he understood that Forsythe and the jurors had discussed the selection of a jury foreperson. The judge promised, if necessary, to contact the security officer who had told him about Forsythe's conversation, and would ask both the security officer and the deputy marshal to testify. The defense attorney then asked for a mistrial or, alternatively, for a poll of the jurors in the event they returned a guilty verdict.

The court reserved ruling on the motion, and called the deputy marshal, Don Eberhardt, to testify. Eberhardt related the following sequence of events:

> I went down to relieve Lou Stiles . . . on the screening station . . . and at the time I got down there the juror . . . was talking to Lou about the fact that she had been dismissed from the jury and that she was supposed to have been appointed as the . . . foreman of the jury. And that she had already made up her mind as to how she intended to vote. And as I recall, she said that there were two jurors that were holding out for acquittal.

Eberhardt further testified that he believed that Forsythe's observation that two jurors would vote for acquittal "was an impression that she had [because] [s]he didn't say anything specifically as far as, as discussing with the other jurors."

The trial judge then called in Forsythe, admonished her, told her that she would be held in contempt if she attempted to talk about the case, and sent her home. Before dismissing the jury for the evening, the court instructed the jurors that they were not to talk with anyone, including Forsythe, about the case. He further instructed the jurors to report to him any attempts at violating this prohibition.

Following the jury's return of a guilty verdict on 28 of the 30 counts, the defendant moved for acquittal and for a new trial, in part based on the Forsythe incident. The court denied all defense motions, comment-

ing that "[t]he court ha[d] reviewed the records pertaining to the jurors and conclude[d] that there was no misconduct on the part of the jurors who decided the case. Having reached this conclusion the court is not required to comment on the behavior of the alternate juror."

The defendant now argues that Forsythe's communication with the deputy marshal implied that she and other jurors had communicated improperly during the proofs, and that a full evidentiary hearing into possible juror misconduct was required. As we previously have held, "[s]ince the trial judge is in the best position to determine the nature and extent of alleged jury misconduct, his decision on the scope of proceedings necessary to discover misconduct is reviewed only for an abuse of discretion." *United States v. Shackelford*, 777 F.2d 1141, 1145 (6th Cir.1985), *cert. denied*, 476 U.S. 1119, 106 S.Ct. 1981, 90 L.Ed.2d 663 (1986). In addition, where failure to hold a hearing on jury misconduct is raised for the first time on appeal, the defendant "must demonstrate from facts in the record that actual prejudice occurred." *United States v. Walton*, 908 F.2d 1289, 1297 (6th Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 and *cert. denied*, 498 U.S. 989, 111 S.Ct. 530, 112 L.Ed.2d 541 and *cert. denied*, 498 U.S. 990, 111 S.Ct. 532, 112 L.Ed.2d 542 (1990).

The court's discovery during trial of a juror's exposure to extrinsic evidence or an outside influence requires that the court "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Remmer v. United States*, 347 U.S. 227, 230, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). In *Remmer*, a juror reported to the trial judge that an unnamed outside interest had contacted the juror and implied that the juror would profit from the defendant's acquittal. Without informing the defendant, the court retained the services of the Federal Bureau of Investigation. Based on the FBI's report, the court concluded that the remark had been a joke. The defendant, in turn, did not learn of the incident until after the jury had returned its verdict. *Id.* at 228, 74 S.Ct. at 451. On these facts, the court found that a hearing, and possibly a new trial, was required. *Id.* at 229–30, 74 S.Ct. at 451–52.

We have held that the *Remmer* rationale applies across-the-board to those cases where an outside influence has been identified. As we found in *United States v. Pennell*, 737 F.2d 521 (6th Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985), "'[d]ue process means a jury capable and willing to decide the case solely on the evidence before it....'" *Id.* at 532 (citation omitted). Exclusion of outside information is essential, "because only evidence offered against the defendant at the witness stand in a public courtroom receives the judicial protection of the defendant's sixth amendment right of confrontation, cross-examination, and counsel." *United States v. Rowe*, 906 F.2d 654, 656 (11th Cir.1990).

In contrast, the strict requirements of *Remmer* do not apply absent the presence of an outside influence on the jury. *Shackelford*, 777 F.2d at 1145. In *Shackelford*, the judge permitted a juror to leave the jury room during deliberation, so that the juror could notify his waiting wife that he would not be able to accompany her on a planned excursion. Shortly thereafter, the jury returned a guilty verdict. When the defendant moved for an evidentiary hearing to determine whether there had been juror misconduct, the court denied the motion. We affirmed the trial court's denial, noting that the defendant had failed to demonstrate the existence of any external influence. *Id.* at 1144–45.

We also noted in *Shackelford* that because the request for a hearing came after a return of the verdict, further inquiry risked violating Rule 606(b) of the Federal Rules of Evidence. *Id.* at 1145. This rule prohibits a juror from testifying, post verdict,

> as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may

testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

Fed.R.Evid. 606(b).

■■■ Similarly, we find that the district court here did not abuse its discretion in failing to hold a more extensive evidentiary hearing, because there was no evidence of an external influence on the jury. Rather, the alleged misconduct was admittedly internal, involving juror Forsythe.

The defendant argues that we previously have held that the potential for prejudice flowing from internal influence is "much more severe," citing *dicta* in *Pennell,* that "juror misconduct can be more prejudicial than unauthorized communications by third parties." 737 F.2d at 533 n. 11. However, the juror misconduct referenced in that case was itself a particular type of outside influence: a juror's active goal of gaining employment with the prosecutor's office. *Id.* at 532–33 (citing *Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). There was no such evidence of juror bias in this case.

■■■ Accordingly, *Remmer* does not control here. While the judge had "a duty to investigate and to determine whether there may have been a violation of the sixth amendment," it was within his discretion to determine "the scope of proceedings necessary." *Shackelford,* 777 F.2d at 1145. In addition, despite the defendant's contrary representations, he raises the necessity of a *Remmer* hearing for the first time on appeal. In the court below, he asked only for a mistrial, or absent that, a poll of the jury *if* a guilty verdict was returned. Therefore, the defendant must prove not only an abuse of discretion, but also "actual prejudice." *See Walton,* 908 F.2d at 1297.

The alleged juror misconduct was evidenced by Forsythe's statements, not to other jurors, but to a deputy marshal, after Forsythe was suspended from the jury. In relating her disappointment, she told the deputy marshal that "she was supposed to have been appointed as the ... foreman of the jury." Forsythe's remark is hardly evidence of actual prejudice. Even if the jurors did discuss among themselves who might be elected foreperson, it is hard to see how handling such administrative details prior to deliberation would prejudice the defendant.

The other statement attributed to Forsythe, words to the effect that "there were two jurors that were holding out for acquittal," does not require reversal. The deputy marshal to whom the statement was made testified he believed Forsythe was merely relating her "impression." He did not understand her to say she had discussed guilt or innocence with others, or that any polls had been taken.

After taking this testimony, the trial court concluded that any possible harm could be handled by admonishing Forsythe and instructing her not to talk with the other jurors. The court gave a similar instruction to the deliberating jurors. Although the defendant asked that the investigation be broadened *if* a guilty verdict were returned, it was up to the trial court to determine the scope of the proceedings. Moreover, the defendant's interpretation of a reasonable investigation, polling the jurors after the verdict was returned, clearly implicates the prohibition of Fed.R.Evid. 606(b). On these facts, it cannot be said that the district court abused its discretion, much less that the defendant endured actual prejudice.

### E.

Prior to his sentencing, the defendant objected to the Presentence Investigation Report on two primary bases. First, he objected to the probation office's recommendation for a two-level increase based on the defendant's supervisory role in the crimes. Second, the defendant objected to the recommendation that there be no downward departure.

The defendant contends that he could not have been a leader or supervisor in the criminal scheme because he and Terry Griffith were the only players. In addition, the defendant argues that the offense level increase for criminal leaders is appropriate only for those who profit from their criminal activity.

He claims that he did not profit, because he gambled away all the fruits of his illegal activity.

The federal sentencing guidelines provide for a two-level increase "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity" involving less than five participants. U.S.S.G. § 3B1.1(c). Factors that are relevant in determining whether a defendant's sentence should be enhanced include, *inter alia,*

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, ... the degree of participation in planning or organizing the offense, ... and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. (n. 4).

We have held that the trial court's determination that a defendant played an aggravating role under section 3B1.1 is " 'heavily dependent on the facts.' " *United States v. Okayfor,* 996 F.2d 116, 122 (6th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 238, 126 L.Ed.2d 192 (1993). Accordingly, any such sentence enhancement "is reversible only if clearly erroneous." *Id.*

The district court's decision to apply the two-level enhancement under section 3B1.1(c) was not clearly erroneous. The defendant's accountant and his bookkeeper both testified at trial as to the defendant's organizational role in the partnership. In addition, it was the defendant alone who solicited the bulk purchasers and arranged for disposal of the fraudulently obtained inventory.

The defendant's argument that the enhancement is applicable only to a defendant who profits more from the enterprise than his accomplices is misplaced. The guidelines background reference to "persons who ... tend to profit more ... present a greater danger ... and/or are more likely to recidivate," is offered in justification for the higher three- and four-level increases applicable to criminal activity involving at least five participants. U.S.S.G. § 3B1.1, comment. (backg'd.). Accordingly, the defendant's claim that he did not profit because he gambled away the proceeds of his criminal activity is spurious.

The defendant further argues that his rehabilitation effort to cure his gambling addiction is a mitigating factor under U.S.S.G. § 5K2.0. On this basis, the defendant contends the district court erred in refusing the defendant's request for a downward departure.

As to discretionary departures from the sentencing guidelines, the guidelines provide that the district court,

> may impose a sentence outside the range established by the applicable guideline, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

U.S.S.G. § 5K2.0. Where the district court " 'was not unaware of its discretion to depart from the guideline range, and the sentence was not imposed in violation of law or as a result of an incorrect application of the guidelines, the failure to depart is not cognizable on appeal.' " *United States v. Hamilton,* 949 F.2d 190, 192 (6th Cir.1991) (citations omitted). Given that the defendant's sentence was within the law and the calculated guideline range, the district court's refusal to depart must be affirmed.

## IV.

We **VACATE** the defendant's convictions on counts 20 through 23. Otherwise, we **AFFIRM** the convictions and the district court's sentencing order.