45 F.3d 431
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Bruce SAMS, Defendant-Appellant.
 No. 94-3209.
 United States Court of Appeals, Sixth Circuit.
 Dec. 20, 1994.
 
 1
 Before: RYAN and BATCHELDER, Circuit Judges; and EDGAR, District Judge.*
 
 
 2
 EDGAR, District Judge.
 
 
 3
 Bruce Sams appeals his conviction on four counts of transporting stolen goods in interstate commerce valued more than $5,000.00, 18 U.S.C. Sec. 2314; and on one count of wire fraud, 18 U.S.C. Sec. 1343. He also appeals his sentence. Sams argues that there was insufficient evidence to convict him on any of these charges, and he challenges the district court's sentencing determination that he had not accepted responsibility. We AFFIRM both Sams' conviction and his sentence.
 
 I.
 
 4
 The jury in this case heard that in 1990, Sams and another person, Raymond Fee, started a business known as "Badger Trucking, Inc." The company, which was incorporated in Indiana, operated out of the home of Fee's daughter in Fort Wayne, Indiana. The company's fleet initially consisted of a big box refrigerated truck, a pickup truck, and a trailer. Badger Trucking bought a small number of tires for its trucks and trailer from the Michel Tire Company outlet in Fort Wayne. It also had minor tire repairs done there. Michel Tire, in addition to repairing tires and selling tires at retail prices, sold passenger and truck tires at wholesale prices. It had outlets in the greater Cincinnati, Ohio area as well as an outlet in Fort Wayne.
 
 
 5
 Hugh Littleford served as manager of the Michel Tire outlet in Fort Wayne. Sams became acquainted with Littleford while conducting routine business with Michel Tire. During the summer or early fall of 1991 Sams began purchasing tires from Littleford, not for Badger Trucking's trucks and trailer, but for resale to other companies. Thereafter, Sams became interested in purchasing on credit a large volume of tires for resale. Littleford contacted the main office of Michel Tire in Cincinnati to get approval of Sams' proposed purchase and credit request. The main office informed Littleford that it would need a credit history and personal financial report from Sams and Fee before it could approve the deal.
 
 
 6
 On October 11, 1991, Sams faxed financial statements to Michel Tire's main office in Cincinnati. Included in this fax was a business financial statement of Badger Trucking to which Sams forged Fee's signature. Fee testified that this statement contained numerous misrepresentations of Badger Trucking's assets. According to Fee, the company's stated cash of $108,893 was "grossly overstated" and was more like $8,000; its stated marketable securities of $10,000 did not exist; its other stated current assets of $235,200 did not exist; its fixed assets of $185,000 were more like $185; and its stated gross income of $829,000 was more like $75,000.
 
 
 7
 After reviewing the financial information, Michel Tire's main office concluded that Badger Trucking, and apparently Sams and Fee, were nevertheless not sufficiently creditworthy for the kind of business that Sams wanted to do with Michel Tire. Michel Tire, however, made a counterproposal to Sams. If Badger Trucking would pay Michel Tire with cash or a certified check, then Michel Tire would release the tires to Badger Trucking and sell them at a two percent discount. Michel Tire's Matt Geiger relayed this counterproposal to Littleford who, in turn, relayed it to Sams. Sams reluctantly agreed to the counterproposal.
 
 
 8
 On January 21, 1992, Badger Trucking issued a cashier's check for $66,554.50 to Michel Tire in exchange for its first load of tires. Sams then told Littleford that, "We cannot continue this way. I need more time." Littleford thereafter agreed that for subsequent purchases Sams could give him a noncertified check and Littleford would hold the check until Sams told him that Badger Trucking's account contained sufficient funds to cover the check. Littleford did not seek approval of this arrangement with Michel Tire's main office.
 
 
 9
 From January 30, 1992 to February 7, 1992, Sams purchased tires from Michel Tire with seven noncertified checks ranging from $87,000 to $38,629 each. These checks were eventually made good. However, on February 10th, 11th, 12th and 13th, Michel Tire sold an additional 2,139 tires to Sams. Sams gave Littleford eight noncertified checks in exchange for these tires. Littleford held these checks and contacted Sams daily to determine when he could deposit them. Sams continued to respond that he needed more time. After Littleford had held the checks for approximately two weeks, the main office of Michel Tire had the Fort Wayne outlet's bank account swept, and it was learned that the checks for the February 10th through 13th purchases had not been deposited. Anthony Michel, president of Michel Tire, then had six to eight telephone conversations with Sams about the checks. During those conversations, Sams posed as Raymond Fee. Sams then stopped payment on the checks. Although Sams contended that he always intended to make payment to Michel Tire on the eight checks, he never did so. There was evidence that at the time that Sams wrote the eight checks to cover the February 10th through 13th tire purchases, Badger Trucking did not have sufficient funds in its account to cover any one of the checks.
 
 
 10
 Michel Tire estimates that it lost $700,000 as a result of the nonpayment on the eight checks. Sams apparently placed another order for $160,000 to $180,000 worth of tires while Michel Tire was holding his checks, but Anthony Michel cancelled delivery of these tires upon discovering that Sams had given Michel Tire noncertified checks for the February 10th through 13th purchases.
 
 
 11
 From July 1991 through February 7, 1992, Sams had purchased approximately 2,533 tires from Michel Tire at an average cost of approximately $345 per tire. Badger Trucking did pay Michel Tire for these tires. However, Sams sold the tires purchased during this time period for an average price of $273, or $72 below the average purchase price, for a total loss of approximately $165,640. As for the February 10th through 13th purchases, Sams purchased 2,139 tires at an average cost of approximately $348 per tire and sold them at an average price of approximately $271, for a projected total loss of $146,953.
 
 
 12
 On February 7, 1992, Sams bought a $70,000 1992 Mercedes Benz automobile. He made a downpayment on this purchase with a check in the amount of $32,000 drawn on Badger Trucking's account. On the same date, Sams purchased two 1992 Peterbilt tractors for $160,974. He made a downpayment on this purchase with a check in the amount of $43,974 drawn on Badger Trucking's account. Both of these checks subsequently cleared.
 
 
 13
 Sams was convicted for transporting the truck tires in interstate commerce on February 10, 11, 12, and 13, 1992. The government alleged that these truck tires were in fact stolen and taken by fraud because Sams falsely represented that he would pay for the tires, when in fact he had no intention of paying for them. Sams was also convicted of wire fraud for faxing the false financial statement to Michel Tire on October 11, 1991, in furtherance of a scheme to defraud.
 
 II.
 
 14
 The standard of review for claims of insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see United States v. Koehler, 24 F.3d 867, 870 (6th Cir.), petition for cert. filed, 63 U.S.L.W. 3296 (U.S. Sept. 29, 1994) (No. 94-580). Circumstantial evidence can sufficiently support a jury's determination of guilt. United States v. Griffith, 17 F.3d 865, 872 (6th Cir.), cert. denied, 115 S.Ct. 149 (1994).
 
 
 15
 To establish a violation of Sec. 2314, the government must prove that:
 
 
 16
 (1) The defendant transported or caused the transportation of property;
 
 
 17
 (2) The property was transported in interstate commerce;
 
 
 18
 (3) The property was valued at $5,000 or more; and
 
 
 19
 (4) The defendant had knowledge that the property was stolen, converted, or fraudulently taken from its rightful owner.
 
 
 20
 Griffith, 17 F.3d at 872; United States v. Weiner, 755 F.Supp. 748, 752 (E.D.Mich.1991), aff'd, 988 F.2d 629 (6th Cir.), cert. denied, 114 S.Ct. 142 (1993).
 
 
 21
 Sams contends that the evidence fails to support the fourth element of Sec. 2314, namely that he knew that the tires were stolen, converted, or fraudulently taken from their rightful owner. He contends that he always intended to pay for the tires. However, there is considerable evidence in the record from which the jury could have reached the opposite conclusion. This evidence includes proof that (1) Sams consistently sold tires at a substantially lower price than he had bought them from Michel Tire, thereby suggesting that he had no intent to purchase and resell the tires for a profit over a long period of time; (2) Sams faxed a forged financial statement to Michel Tire on October 11, 1991 that falsely overstated Badger Trucking's assets; (3) three days prior to making the first of four large volume tire purchases on February 10-13, and at a time that Sams apparently still owed Michel Tire for at least four prior purchases, Sams purchased a 1992 Mercedes Benz automobile for $70,000 and two 1992 Peterbilt tractors for $160,974; (4) on February 11th and 12th, two days that Sams made tire purchases with noncertified checks drawn on Badger Trucking's account, the account had a balance of minus $15,623 and minus $197,380, respectively; and (5) Sams falsely represented himself as Raymond Fee to Anthony Michel during conversations about how Sams planned to pay for the tires purchased on February 10-13.
 
 
 22
 The defendant's representations about his future intent, such as representations that he was "going" to do something, or that he "would" do something, are actionable under Sec. 2314 if the defendant knew that his representations concerning his future intent were false at the time he made them. United States v. O'Boyle, 680 F.2d 34, 36 (6th Cir.1982). Under the Jackson v. Virginia standard, there was ample evidence from which the jury could have found the defendant guilty beyond a reasonable doubt. To support a conviction, "[i]t is not necessary that the evidence exclude every reasonable hypothesis except that of guilt." United States v. Adamo, 742 F.2d 927, 932 (6th Cir.1984), cert. denied, 469 U.S. 1193 (1985).
 
 
 23
 Likewise, there was sufficient evidence to convict Sams on the wire fraud count, 18 U.S.C. Sec. 1343. The government establishes wire fraud by showing (1) a scheme or artifice to defraud, and (2) use of interstate wires for the purpose of executing the scheme or artifice. Griffith, 17 F.3d at 874; Berent v. Kemper Corp., 973 F.2d 1291, 1294 (6th Cir.1992). "A scheme to defraud within the meaning of the federal statutes must involve 'misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.' " Berent, 973 F.2d at 1294 (quoting Walters v. First Tennessee Bank, N.A. Memphis, 855 F.2d 267, 273 (6th Cir.1988), cert. denied, 489 U.S. 1067 (1989)). The October 11, 1991 false and forged financial statement is itself sufficient evidence of wire fraud, especially when it is coupled with everything else that happened. It is of no consequence that Michel Tire may not have extended credit to Badger Trucking on the basis of the financial statement. Detrimental reliance is not an element of the Sec. 1343 wire fraud offense. Griffith, 17 F.3d at 875. In any event, there was evidence from which the jury could have concluded that Michel Tire did indeed place some reliance on the financial statement.
 
 III.
 
 24
 Sams contends that the district court erred in not reducing his offense level total for acceptance of responsibility under U.S.S.G. Sec. 3E1.1. A district court's determination as to whether a defendant has accepted responsibility under U.S.S.G. Sec. 3E1.1 is a finding of fact and reviewed only for clear error. United States v. Vincent, 20 F.3d 229, 239 (6th Cir.1994). "The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference on review." U.S.S.G. Sec. 3E1.1, comment. (n. 5).
 
 
 25
 Under Sec. 3E1.1 a defendant is entitled to a two-level decrease, or a three-level decrease under some circumstances, in the offense level if the defendant "clearly demonstrates acceptance of responsibility for his offense." U.S.S.G. Sec. 3E1.1(a). The defendant has the burden of establishing by a preponderance of the evidence facts which would lead to a sentence reduction. United States v. Rodriguez, 896 F.2d 1031, 1032 (6th Cir.1990). Where a defendant proceeds to the trial and is convicted, the comments to U.S.S.G. Sec. 3E1.1 provide:
 
 
 26
 This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct)....
 
 
 27
 U.S.S.G. Sec. 3E1.1, comment. (n. 2).
 
 
 28
 In this case, the district court did not commit clear error in finding that Sams failed to accept responsibility. Sams has never admitted that he took the tires fraudulently; has never, therefore, admitted guilt; and has expressed no remorse. Moreover, this case does not present one of those "rare situations" where a defendant accepts responsibility for his conduct despite proceeding to trial.
 
 
 29
 Accordingly, Sams' convictions and sentence are AFFIRMED.
 
 
 
 *
 The Honorable R. Allan Edgar, U.S. District Judge for the Eastern District of Tennessee, sitting by designation